Argued and submitted October 29, 1985, resubmitted In Banc March 12, reversed and remanded for new trial in each case August 12, reconsideration denied November 13, petition for review allowed December 2, 1987 (304 Or 437)

# STATE OF OREGON,
*Respondent,*

*v.*

# THERESA DIXSON,
*Appellant.*

(84-1823; CA A34586 (control))

# STATE OF OREGON,
*Respondent,*

*v.*

# JEFFREY D. DIGBY,
*Appellant.*

(84-1821; CA A34808)

# STATE OF OREGON,
*Respondent,*

*v.*

# LORIN LOU DIXSON,
*Appellant.*

(84 1822; CA A34817)
(Cases consolidated)

740 P2d 1224

James C. Coffey, North Bend, argued the cause for appellant Jeffrey D. Digby. With him on the brief were Hayner, Waring, Stebbins & Coffey, North Bend; Nicholas C. Nylander and Flaxel, Todd & Nylander, North Bend; and Kathleen P. Eymann and Chandler & Stokes, Coos Bay.

Nicholas C. Nylander, North Bend, argued the cause for appellant Lorin Lou Dixson. With him on the brief were Flaxel, Todd & Nylander, North Bend; James C. Coffey and Hayner, Waring, Stebbins & Coffey, North Bend; and Kathleen P. Eymann and Chandler & Stokes, Coos Bay.

Kathleen P. Eymann and Chandler & Stokes, Coos Bay, filed the brief for appellant Theresa Dixson. With them on the brief were James C. Coffey and Hayner, Waring, Stebbins & Coffey, North Bend; Nicholas C. Nylander and Flaxel, Todd & Nylander, North Bend.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

YOUNG, J.

Buttler, J., specially concurring.

Van Hoomissen, J., dissenting.

Rossman, J., dissenting.

## YOUNG, J.

In these consolidated cases, defendants appeal from their convictions for the manufacture and possession of a controlled substance. They contend that the trial court erred in denying their motions to suppress evidence seized from the Dixsons' property in a warrantless search. The issue is whether Article I, section 9,[1] of the Oregon Constitution requires a warrant for a search of an "open field." We hold that it does and reverse.

The Dixsons were purchasing the property in question, consisting of 40 acres, and lived in a home approximately 800 feet from the area where the marijuana plants were seized. That area was outside the curtilage of the home. Only a portion of the 40 acres was fenced. Lorin Dixson cultivated the land with the help of Digby. Sheriff's deputies, acting on a tip from an informant that marijuana was·growing on property owned by Rogge Lumber Company, went to the area and saw the Dixson residence, access roads and a vehicle being used to transport water. One of the officers then checked with the assessor's office to determine the property boundaries in the area. The following day, he flew over the area[2] and saw several patches of what he believed to be growing marijuana. He concluded, mistakenly, that the plants were growing on the Rogge property and obtained Rogge's consent to search its land for marijuana.

To get to the plants, the officers drove on a public road to a dirt logging road on the Dixson property. That road had not been used for some time and was not passable with a passenger car. At the property line, the Dixsons had posted a "No Hunting" sign on a wire cable that was stretched across the road to block access. They had also felled a large madrona tree across it to prevent access. The officers walked around the cable and continued down the logging road to another dirt road, which also had a wire cable stretched across it with a "No Hunting" sign attached. They walked around that cable

---

[1] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

[2] Defendants do not attack the validity of the aerial observation.

as well and came to another "No Hunting" sign. Vegetation on and around the Dixson property was thick brush and, as the trial court found, the marijuana was not visible from ground level other than from the Dixson property. The officers saw the marijuana plants by pushing aside the brush after entering the land. They also encountered Lorin Dixson and Digby at the site of the plants.

The trial court found that Digby had a proprietary interest in the marijuana plants but no ownership interest in or right to possess the Dixson land. Therefore, it concluded that Digby did not have "standing" to object to the search that occurred on the Dixsons' property. With respect to the Dixsons, the trial court, relying entirely on *Oliver v. United States,* 466 US 170, 104 S Ct 1735, 80 L Ed 2d 214 (1984), held that they had no legitimate expectation that the area outside of their curtilage would remain free from warrantless intrusion by the sheriff's deputies. Accordingly, it denied all of the motions to suppress.

The decisive issue is not, as the trial court apparently thought, one of federal law. Whether defendant's land is constitutionally protected depends, in the first instance, not on United States Supreme Court cases interpreting the Fourth Amendment, but on the basic principles underlying the Oregon Constitution. We derive our analysis from them.[3] *See State v. Kennedy,* 295 Or 260, 666 P2d 1316 (1983). While those principles may be similar to those underlying the Fourth Amendment, we need not join the federal retreat from the constitutional requirements.[4]

---

[3] We noted in *State v. Russo,* 68 Or App 760, 764 n 2, 683 P2d 163 (1984), that "[t]he existence and extent of an 'open field' doctrine under the Oregon Constitution is an open question."

[4] In his dissent, Judge Van Hoomissen ignores a basic rule of Oregon constitutional law: The Oregon Constitution is independent of the federal or other state constitutions. Federal constitutional opinions are relevant to Oregon decisions only to the extent that they convince by their reasoning, even when the federal and Oregon constitutions have the same origins and are designed to protect the same values. *State v. Soriano,* 68 Or App 642, 645-46, 684 P2d 1220, *opinion adopted* 298 Or 392, 693 P2d 26 (1984); *State v. Kennedy, supra.* While Article I, section 9, and the Fourth Amendment have the same roots and reflect the same values, there is no reason to believe that the United States Supreme Court in 1984 (the year of *Oliver v. United States, supra*) was better able to apply those values than is this court in 1987. Neither court can claim any special channel to those who adopted the constitutions. By relying on older cases such as *State v. Flores,* 280 Or 273, 570 P2d 965 (1977), and *State v. Florance,* 270 Or

The dispositive question is whether Article I, section 9, protects defendants from police intrusions onto the land where the marijuana was found. If it does, the deputies violated the constitutional protection, because they did not have a search warrant and the circumstances did not create an exception to the warrant requirement. If the land were within the curtilage of defendants' home, it would come within the specific constitutional language of "persons, houses, papers, and effects * * *." *State v. Lee,* 120 Or 643, 253 P 533 (1927); *State v. Ohling,* 70 Or App 249, 688 P2d 1384, *rev den* 298 Or 334 (1984). Because it is not, we must determine whether Article I, section 9, is concerned exclusively with the rights that it expressly mentions or whether it uses those rights as tools to achieve a broader purpose. That is, does the constitution protect property as property, or is its protection of property a means to a greater end?

We believe it obvious that the constitution protects property in order to protect something more—one's personalty or individuality—from official control. It does so by adapting traditional trespass law to create areas where officials may not go. Article I, section 9, and the Fourth Amendment are the direct product of the experience that Americans had during the pre-revolutionary period with uncontrolled executive power. The colonists (and their supporters in England) looked to safeguards against arbitrary searches and seizures as one of the bulwarks of the liberty for which they

---

169, 527 P2d 1202 (1974), the dissent evades current Oregon law.

It is also curious that the dissent ignores federal law when it is apparently contrary to its position. Its attack on our willingness to extend constitutional protections beyond the explicit constitutional language in order to preserve constitutional values conveniently ignores that that is precisely what the federal courts have purported to do since *Katz v. United States, infra.* Indeed, our position is in some respects closer to the federal position than is the dissent's. Like the federal courts, we recognize the constitutional importance of protecting privacy; we simply consider the *Katz* test to be insufficiently objective and therefore inadequate to place clear limits on official action. The dissent would apparently retain the pre-*Katz* property-only law in its entirety, using the letter of the law to kill the spirit.

Finally, we have not "overturned" previous Oregon cases. *State v. Evans,* 143 Or 603, 22 P2d 496 (1933), concerned the search of a hunting camp *on public land;* it is not authority for the "open fields" doctrine. Neither it, *State v. Lee, infra,* nor the other cases the dissent cites considered the effect that the protection of privacy inherent in Article I, section 9, might have in extending the constitution's express property-based language. That is an issue of first impression under the Oregon Constitution. We must resolve it by applying the constitutional purpose, not by stale attacks on supposed "judicial activism."

fought the Revolution. *See* Jensen, *The Founding of a Nation: A History of the American Revolution, 1763-1776,* 155-58, 258, 377-78 (1968); Cooley, *Constitutional Limitations,* 300-303 n 1 (1st ed 1868).

The tie between liberty and the right to exclude others from one's property remained basic in American thinking after the Revolution. In one's home one could be oneself. Writers frequently quoted a statement the Earl of Chatham, an English supporter of the American colonists, made before the revolution:

> "The poorest man may, in his cottage, bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the king of England may not enter; all his force dares not cross the threshold of the ruined tenement." *Quoted in* Cooley, *Constitutional Limitations, supra,* 299 n 3.

Over a century later, the United States Supreme Court made a similar point in describing the heart of a violation of the Fourth Amendment:

> "It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is *the invasion of the indefeasible right of personal security, personal liberty and private property,* where that right has never been forfeited by his conviction of some public offense * * *." *Boyd v. United States,* 116 US 616, 630, 6 S Ct 524, 29 L Ed 746 (1886). (Emphasis supplied.)

In this century, we call the "liberty" to which Chatham and the Supreme Court referred the "right to privacy." It is inherent in the purpose of Article I, section 9, and we must construe the state constitution to protect that right.

As the Supreme Court said in *State v. Duffy, et al.,* 135 Or 290, 297, 295 P 953 (1931), the purpose of that provision is "to protect the individual in the sanctity of his home and in the *privacy* of his books, papers *and property* * * *." (Emphasis supplied.) The constitution is as extensive as the privacy which it is designed to protect. As a result of the sophisticated technology and increasingly complex society which have developed in this century, we now face situations in which literal adherence to the constitutional language defeats the constitutional purpose. We must extend constitutional protections beyond the express language of the constitution in order to give the constitution continuing life. The

danger in doing so is that we may lose a solid foundation for those rights. We thus must also establish an objective basis for deciding privacy rights that is both based in prior law and comports with the constitutional purpose.

The federal cases give us little help in this regard. At least since *Katz v. United States,* 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967), they have recognized the necessity of protecting privacy beyond the literal terms of the Fourth Amendment. The test they use, however, is so flexible that it has little objective content beyond the specific cases decided.[5] Because the criteria by which to protect privacy under the state constitution remain unclear, we may approach the problem afresh.[6]

There are two issues involved in applying Article I, section 9, to facts which are outside its literal language: First, *what places or things* does the provision protect? Second, *from what kinds of investigations* does it protect them? In *Katz v. United States, supra,* for instance, the court held that the defendant was protected *in* a public telephone booth *from* a device which allowed officers to overhear and record his side of a conversation. Although we might agree with that holding, the "reasonable expectation of privacy" test which courts have drawn from Justice Harlan's concurrence both misdirects our attention and provides no answer to those questions.

The *Katz* test has two parts: the defendant must show both an actual ("subjective") expectation of privacy *and* that the expectation is reasonable, that is, that it is one which

---

[5] For instance, the United States Supreme Court requires a "reasonable expectation of privacy" before it will hold that the Fourth Amendment protects a defendant's rights, even in the kind of property which the constitution specifically lists. *See, e.g., United States v. Jacobson,* 466 US 109, 104 S Ct 1652, 80 L Ed 2d 85 (1984) (private search so invaded the defendant's privacy interest in a package that subsequent warrantless government intrusion was permissible; no discussion of the defendant's continuing property right in it).

[6] The special concurrence suggests that the question is not completely open, because the Oregon Supreme Court has several times referred to "privacy interests" under Article I, section 9. However, the special concurrence is incorrect in its belief that the court's use of that term gives us any guidance for this case. In every case that the Supreme Court has decided the constitutional protection was clear; the object searched was the defendant's "effect." The court refers to "privacy interests" as a *kind of interest* that the constitution protects, not as a method for determining what places or things the constitution protects. In contrast, the question before us in this case is whether a particular place has any constitutional protection at all.

society will honor.[7] The requirement of a subjective expectation turns the issue on its head: a person's rights do not depend on what he or she expects, but on what society provides to everyone. After all, the less the police respect citizens' rights, the lower will likely be a citizen's subjective expectations of privacy. To the degree that this criterion has any value, it is not in determining whether the person, place or thing is protected but in deciding whether particular police action violated that protection.

For instance, a person who chooses to grow marijuana in a front yard does not lose his rights in the yard. The police may not, without a warrant or an exception to the warrant requirement, intrude into the yard. They may, however, look at and photograph the crop from an adjacent public place and use their observations and photographs in applying for a search warrant and as evidence at trial. The reason is not that the yard is unprotected or that the person has no subjective expectation of privacy in it; rather, the police action is proper because the police did not violate the protection that the constitution gives. "Persons may conduct themselves in otherwise protected areas in such a way that their words or acts can be plainly seen or heard outside without any special effort." *State v. Louis,* 296 Or 57, 61, 672 P2d 708 (1983). The *Katz* test leads to a misunderstanding of that fundamental concept.[8]

The second part of the *Katz* test, that the expectation be one which society will honor, simply restates the problem; it is not a test at all. It does not suggest how a court might determine that a particular "expectation" is "reasonable." If that determination depends on something other than the predilictions of those who decide the particular case, it must come from sources which explicate society's understanding of constitutional values. The proper question, thus, is not what the

---

[7] *See* LaFave, *Search and Seizure,* § 2.1 (2nd ed 1986), for a description and discussion of the *Katz* test as the federal courts apply it.

[8] Although the special concurrence would also reject *Katz,* its insistence that the land's physical characteristics make it "private" before it is protected suffers from the same flaws. The special concurrence does correctly recognize that, however we resolve the privacy aspects of these issues, the specific constitutional language sets a floor below which we cannot go. If a police intrusion is a trespass into the defendant's home, papers or effects, it violates the defendant's rights. *See State v. Normile,* 74 Or App 545, 702 P2d 1160, *rev den* 300 Or 162 (1985); *State v. Ohling, supra; State v. Russo,* 68 Or App 760, 683 P2d 163 (1984).

defendant expects or whether that expectation is reasonable but *whether the constitution protects the defendant.* That is the question before us.

■ Although the Supreme Court has not clearly stated what it believes to be the extent of the constitutional protection of privacy, it has indicated that "intrusion upon seclusion," as described in *Restatement (Second) Torts* § 652B, may be a privacy right whose violation gives rise to a tort. *Anderson v. Fisher Broadcasting Co.* 300 Or 452, 712 P2d 803 (1986). That approach is consistent with one commentator's suggestion that privacy protects one's secrecy and solitude. *Note,* "Protecting Privacy Under the Fourth Amendment," 91 Yale LJ 313, 327-30 (1981). Both suggestions are in line with the early understandings of the constitutional purpose discussed above. We follow those suggestions and hold that Article I, section 9, protects a person's right to exclude unwanted intrusions and unwanted methods of intruding from places and things over which that person has legitimate control. The right to exclude protects a person's secrecy and solitude. Whether one has legitimate control over a place or thing can usually be decided on the basis of other law. For this reason, the test states objective criteria which we can readily apply to this case.

■ The officers intruded into areas which are protected under common law trespass rules that existed long before the adoption of either the Fourth Amendment or Article I, section 9. Those areas are also protected under more recent criminal trespass statutes. ORS 164.205(6); ORS 164.245(1). The right to exclude unwanted intruders from them is well established. Although the land is not within the constitutional definition of "home," the well-established right to control entry gives the possessor of the land a privacy interest in it as against anyone with a lesser right to possession. It does not matter that the officers did not have the *mens rea* necessary to subject them to criminal liability. What matters is that statutes and the common law protect the Dixons' land.[9] *See Oliver v. United States,*

---

[9] We do not suggest that defendants' privacy interests are measured solely by their property rights; however, those property rights provide a solid foundation for determining that defendants in this case have privacy interests which the constitution protects.

*supra,* 466 US at 189-93 (Marshall, J., dissenting). The Dixsons, therefore, had a privacy interest in the land which they could assert against the police.

■     Digby's motion should also have been granted. He had a proprietary interest in the growing plants, helped care for them and had the right to exclude others from the property. In short, he was a licensee whose rights in the land were greater than those of the officers. He, along with the Dixsons, had a privacy right in the area in question. His Article I, section 9, rights were violated in the same way as were the Dixsons' rights.[10]

Reversed and remanded for a new trial in each case.

**BUTTLER, J.,** specially concurring.

The upshot of the plurality opinion is that all real property, whether developed or occupied or not, is entitled to the same constitutional protection as "houses" under Article I, section 9, because "the well-established right to control entry gives the possessor of the land a privacy interest in it as against anyone with a lesser right to possession." 87 Or App at 10. There is no doubt that a person has that kind of privacy interest or that Article I, section 9, protects a person's privacy interest in "houses, papers and effects." *State v. Duffy et al.,* 135 Or 290, 295 P 953 (1931). The question is whether, given the right to exclude others, the possessor is entitled to the same constitutional protection afforded houses under Article I, section 9, even though a house includes no more than the house itself and its curtilage. *State v. Lee,* 120 Or 643, 253 P 533 (1927).[1] This court may not overrule *Lee,* as the plurality

---

[10] That a person has the right to exclude, of course, is not necessarily the end of the question. In many situations there will be implied or express consent for members of the public to enter land for hiking, hunting, fishing and similar activities. *See, e.g., State v. Ohling, supra* (implied consent to go to front door of residence). Implied consent might be more likely for an "open field" than for land within the curtilage. However, the issue is whether the owner gave *consent to intrude;* the owner necessarily has the right to exclude. There was no consent here, and the police intrusion was thus impermissible.

[1] Other cases recognize the constitutional protection afforded an individual's house and its curtilage. *See, e.g., State v. Lee,* 120 Or 643, 253 P 533 (1927); *State v. Roles,* 75 Or App 63, 705 P2d 227 (1985); *State v. Ohling,* 70 Or App 249, 688 P2d 1384, *rev den* 298 Or 334 (1984); *State v. Russo,* 68 Or App 760, 683 P2d 163 (1984); *State v. Stanton,* 7 Or App 286, 490 P2d 1274 (1971), *overruled in part State v. Walle,* 52 Or App 963, 630 P2d 377 (1981); *State v. Brown,* 1 Or App 322, 461 P2d 836 (1969), *rev den* (1970).

opinion apparently would do, at least impliedly; neither do I think it is necessary to do so in this case in order to extend constitutional protection to objectively manifested privacy interests in land not within the curtilage.

The occupant of a house is presumed to have a constitutionally protected privacy interest in it, "the quintessential domain protected by the constitutional guarantee against warrantless searches." *State v. Louis,* 296 Or 57, 60, 672 P2d 708 (1983). It need not be shown that the occupant expected privacy. On the other hand, if the person conducts himself in such a way that his acts may be seen readily without technological enhancement, he sacrifices his protected privacy interest, and an officer's observation of the conduct does not constitute a search. *State v. Louis, supra.* I do not understand the plurality to disagree with that proposition.

Our difference lies in resolving a question that is not presented in this case: whether a warrant is necessary before the police may seize contraband that they have observed on land outside the curtilage from a lawful vantage point without technological enhancement. The plurality would say that, although the observation was made without a search, all land is entitled to be treated the same as a house and its curtilage, and therefore a warrant is required in order to seize the obvious contraband. I would hold that, if it is necessary for the officers to trespass on property not within the curtilage in order to observe the activity or contraband in question, there is an unreasonable search and, therefore, any ensuing seizure would be unlawful.

Whether Article I, section 9, extends individual privacy rights beyond "persons, houses, papers and effects" and, if so, on what basis, has not been decided. Defendants argue that we should apply the analysis of *Katz v. United States,* 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967), although no case in the Supreme Court or in this court has adopted that analysis in considering the protection afforded by Article I, section 9. Neither has any case rejected it.

The most that I can make of the decided cases is that there is no *per se* exception to Article I, section 9, applicable to areas outside the curtilage—so-called "open fields." *See Oliver v. United States,* 466 US 170, 104 S Ct 1735, 80 L Ed 2d 214 (1984). Whether the area is protected constitutionally

depends on the facts of each case: has the defendant's cognizable privacy interest been invaded by the police. How that privacy interest is determined is an open question. The Supreme Court's most recent pronouncement on the protection afforded by the Oregon Constitution is in *State v. Owens,* 302 Or 196, 206, 729 P2d 524 (1986):

> "Article I, section 9, protects privacy and possessory interests. A 'search' occurs when a person's privacy interests are invaded."

In *Owens,* the object seized and searched was a transparent container—an "effect" specifically protected by Article I, section 9. Nevertheless, the court stated that not all containers merit the same protection, because some, such as a transparent one, announce their contents; therefore, "no cognizable privacy interest inheres in their contents," 302 Or at 206, and they may be opened and their contents seized. The court did not elaborate on how it determines whether a person has a "cognizable privacy interest"; however, the apparent reasoning is that one who carries something in a transparent container has manifested no expectation that the contents will be private, because they are in "plain view."

Prior decisions have dealt briefly with the subject and suggest that the test is whether the defendant had a reasonable expectation of privacy in the thing searched. *See State v. Perry,* 298 Or 21, 688 P2d 827 (1984); *State v. Elkins,* 245 Or 279, 422 P2d 250 (1966). In *State v. Holt,* 291 Or 343, 630 P2d 854 (1981), the court applied the *Katz* analysis in considering whether the protection of Article I, section 9, extended beyond a physical trespass, although it did so because the defendant had not argued that the analysis should be different than under the Fourth Amendment.

Under *Katz,* whether a claimed privacy interest deserves constitutional protection depends on whether the person has exhibited an actual (subjective) expectation of privacy and, if so, whether that expectation is one that society is prepared to recognize as reasonable. If both parts of the test are satisfied, the individual's privacy interest is protected, even though the place in which his privacy right is asserted is not mentioned specifically in Article I, section 9. Because I believe that both parts of the *Katz* test present problems as applied to a person's privacy interest in real property, I perceive no reason to adopt it here. As to the first part—the so-

called "subjective" expectation—it would seem that the more tolerant the courts or the legislature are of governmental intrusion, the lower the individual's subjective expectations will be, because the conduct, over time, will become less offensive to us all.[2] Accordingly, an objective standard would be preferable. With respect to real property in particular, frequently there are objective indications that privacy is expected. If the property is protected from public view by virtue of its topography or vegetation, there is, without more, an objective manifestation that the place is private, without regard to the person's subjective expectations. In such a case, one need not build a wall around it or even post "no trespassing" signs to manifest that expectation. As we said in *State v. Russo, supra,* n 1, there is a "natural exclusionary barrier." 68 Or App at 764.

On the other hand, if the property's physical characteristics are such that the area in question may be seen without technological enhancement from a public place, such as a road, no amount of subjective expectation[3] that activities in that area will be private will make the area a constitutionally protected one. In that circumstance, the possessor would be in a situation analogous to the defendant in *State v. Owens, supra,* who carried contraband in a transparent vial (her effect) that announced its contents, thereby making it permissible for the police to seize it and test its contents.

Similarly, the second part of the *Katz* analysis—whether the expectation of privacy is a reasonable one that society is prepared to honor—is not helpful as applied to a person's privacy interest in real property. If the lawful

---

[2] As Justice Marshall noted in his dissent in *Oliver v. United States, supra,* 466 US at 197 n 21:

"Perhaps the most serious danger in the decision today is that, if the police are permitted routinely to engage in such behavior, it will gradually become less offensive to us all. As Justice Brandeis once observed: 'Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law ....' *Olmstead v. United States,* 277 US, 438, 485, 72 L Ed 944, 48 S Ct 564, 66 ALR 376 (dissenting opinion)."

[3] However, some *objective* manifestations that privacy is expected may succeed in affording protection, while others may not. For example, a solid wall that is high enough to prevent members of the public from viewing activities on the property would probably be sufficient; however, a fence through which a person may see without technological enhancement would not, even if "no trespassing" signs were posted at regular intervals.

occupier or owner of the property has a cognizable privacy interest in the area in question, he is entitled to constitutional protection against an unreasonable search. The common law of trespass protects his right to exclude others; in addition, the legislature has made it a crime for one to enter on premises when he is not licensed or privileged to do so. *See* ORS 164.245;[4] ORS 164.205(3)(4)(6).[5] Accordingly, a search is unreasonable if, in order to observe activities in the area of the property in question without technological enhancement, it is necessary to trespass on the property.

Here, the cultivated area of the Dixson's property was not visible from any place on the ground where the public, including law enforcement officers, had a right to be. Because the old skid roads that entered the property were not passable in passenger cars, and each of them was cabled off and "No Hunting" signs were posted, there was nothing to indicate to a reasonable person that he could enter without permission. The Dixsons' nearest neighbor is approximately one-half mile away. Ready access from the Rogge land was prevented by impenetrable brush. The Dixsons, therefore, have a cognizable privacy interest in the area in question that is protected by Article I, section 9.

When the officers entered the Dixsons' land, they were trespassers invading the Dixsons' privacy interests and

---

[4] ORS 164.245 provides:

"(1) A person commits the crime of criminal trespass in the second degree if the person enters or remains unlawfully in or upon premises.

"(2) Criminal trespass in the second degree is a Class C misdemeanor."

[5] ORS 164.205(3),(4) and (6) provide:

"As used in ORS 164.205 to 164.270, except as the context requires otherwise:

"(3) 'Enter or remain unlawfully' means:

"(a) To enter or remain in or upon premises when the premises, at the time of such entry or remaining, are not open to the public or when the entrant is not otherwise licensed or privileged to do so; or

"(b) To fail to leave premises that are open to the public after being lawfully directed to do so by the person in charge.

"(4) 'Open to the public' means premises which by their physical nature, function, custom, usage, notice or lack thereof or other circumstances at the time would cause a reasonable person to believe that no permission to enter or remain is required.

"* * * * *

"(6) 'Premises' includes any building and any real property, whether privately or publicly owned."

were engaged in a search for which they had no warrant and for which there was no exception to the warrant requirement. *State v. Owens, supra.* One of them recognized that fact in testifying that he had no intention of trespassing on the Dixson property but entered under the mistaken belief that he was on Rogge's property. The evidence was seized as a result of an unreasonable search.

Accordingly, albeit for slightly different reasons, I concur in the result reached by the plurality with respect to all three cases.

Richardson and Warren, JJ., join in this special concurrence.

## VAN HOOMISSEN, J., dissenting.

I find no *principled* reason to impose a higher standard governing law enforcement officers under Article I, section 9, of the Oregon Constitution, than is imposed by the Fourth Amendment.[1] I would hold that Article I, section 9, is inapplicable in "open fields." *See Hester v. United States,* 265 US 57, 44 S Ct 445, 68 L Ed 898 (1924).[2] That construction is faithful to the text of Article I, section 9, and to its original intent. It also is supported by Oregon authority, by recent federal authority and by authority from other states. It provides for a uniform rule of law enforcement between state and federal officers. No unique local conditions support a contrary construction. The plurality's analysis would merely require

---

[1] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[2] In *Hester v. United States, supra,* the United States Supreme Court stated:

"[T]he special protection accorded by the 4th Amendment to the people in their 'persons, houses, papers, and effects' is not extended to the open fields. The distinction between the latter and the house is as old as the common law. 4 Bl. Com. 223, 225, 226." 265 US at 59.

law enforcement officers, in most situations, to use aerial surveillance to gather the information necessary to obtain a warrant or to justify warrantless entry onto the property. It is not easy to see how such a requirement would advance legitimate privacy interests. *See Oliver v. United States,* 466 US 170, 179 n 9, 104 S Ct 1735, 80 L Ed 2d 214 (1984). Furthermore, the plurality has decided this case on a theory not raised in the trial court and not briefed or argued on appeal. Therefore, I respectfully dissent.

## Text

The plain meaning of the explicit text of Article I, section 9, delineates the scope of its affirmative protections. It protects "persons, houses, papers, and effects." The plurality forthrightly concedes that the place where the deputies found the marijuana growing was outside the curtilage of the Dixsons' home, and, therefore, does not come within the "specific constitutional language" of Article I, section 9. 87 Or App at 6. That concession should end this court's inquiry. When the language of the constitution is plain and certain, there is no reason for applying rules of construction. *State ex rel Bell v. Pierce et al,* 118 Or 533, 540, 247 P 812 (1926); *see* Cooley, *Constitutional Limitations* 55 (1868). Justice Linde frequently exhorts lawyers and judges to "read the statute." The same rule ought to apply to the constitution.

## History

The plurality points to no history to show that either the drafters of the Oregon Constitution, or the people who ratified it, intended the explicit text of Article I, section 9, to encompass more than what it says.[3] *See State v. Flores,* 280 Or 273, 280-81, 570 P2d 965 (1977) (no indication that drafters of Oregon Constitution intended that Article I, section 9, be different from the Fourth Amendment); *State v. Flores, supra,* 280 Or at 284, (Linde, J., dissenting) (Article I, section 9, was meant to embody the same principle as Fourth Amendment and early state constitutions); *State v. Kennedy,* 295 Or 260, 270, 666 P2d 1316 (1983) (absent evidence to the contrary,

---

[3]    "The object of construction, as applied to a written constitution, is to *give effect to the intent of the people in adopting it.*" Cooley, *Constitutional Limitations, supra,* 55. (Emphasis in original).

substantially identical terms in state and federal constitutions are presumed to have the same objective); *State v. Robinson,* 64 Or App 770, 773, 669 P2d 1175 (1983) (nothing indicates that the question of whether conduct constitutes a search is analyzed differently under state and federal constitutions); *see also State v. Holt,* 291 Or 343, 345 n 1, 630 P2d 854 (1981) (Fourth Amendment and Article I, section 9, assumed to be coextensive).[4]

### Oregon Authority

In *State v. Lee,* 120 Or 643, 253 P 533 (1927), the Supreme Court articulated the equivalent of an "open fields" doctrine under the Oregon Constitution. In *Lee,* the court recognized the common law distinction between a "house" and the land inside its curtilage and land beyond the curtilage in the "open fields."[5] The Supreme Court had no reason to

---

[4] In 1962, the Oregon Constitutional Revision Commission recommended that Article I, section 9, be changed to read:

"The right of the people to be secure in their persons, houses *and other property,* papers and effects, against unreasonable searches and seizures may not be violated; * * *." (Emphasis supplied.)

*See* Report of The Commission for Constitutional Revision, proposed Article I, section 7, at 6 (1962). The language, "and other property," was copied from Article I, section 14, of the Alaska Constitution. The Commission's proposed revision of the Oregon Constitution was not submitted to the people. The effect of the majority's result in this case is to place the words "and other property" in the Oregon Constitution without a vote of the people.

[5] In *State v. Lee, supra,* 120 Or at 649, the Supreme Court stated:

"Generally speaking, the curtilage is the space of ground adjoining the dwelling-house, used in connection therewith in the conduct of family affairs and for carrying on domestic purposes usually including the buildings occupied in connection with the dwelling-house. It is the propinquity to a dwelling, and the use in connection with it for family purposes which is to be regarded.

"The question in regard to the search of a dwelling-house is not in this case. Article I, Section 9 of the Constitution of Oregon provides that 'no law shall violate the right of the people to be secure in their persons, houses, papers and effects against unreasonable search or seizure * * *.'

"There is no intimation in the present case that the building described as a 'barn' was used for any family or domestic purpose, but solely as a distillery building for housing a still and storing articles and products necessary for the manufacture and sale of intoxicating liquors. Illicit mash, stills and intoxicating liquor are contraband. No person can hold title or ownership therein. The Constitution invoked in this case is not applicable to searches and seizures of contraband goods situated and found by an officer in the manner described herein."

This court recently relied on *State v. Lee, supra,* in applying Article I, section 9, to trespasses in *State v. Russo,* 68 Or App 760, 683 P2d 163 (1984) and *State v. Westlund,* 75 Or App 43, 705 P2d 208 (1985), *affirmed in part, reversed in part,* 302 Or 225, 729

recognize that distinction in *Lee,* except to recognize the common law rule that the legal protection afforded to each category of real property was different. The specially concurring opinion correctly observes that the plurality overrules *Lee,* at least by implication. 87 Or App at 11.

The Supreme Court also instructed in *Lee* that Article I, section 9, is to be construed "in conformity with the principles of the common law." 120 Or at 649.[6] *See* Cooley, *Constitutional Limitations, supra,* at 60-62. Again, the parallel with *Hester* is evident. Construing Article I, section 9, in conformity with those principles, it is clear that "open fields" do not enjoy any special protection under the Oregon Constitution.

In *State v. Evans,* 143 Or 603, 611, 22 P2d 496 (1933), the Supreme Court stated:

> "The inhibition against search and seizure does not extend to * * * open fields." (Citations omitted.)

The most recent Oregon State Bar publication on Search and Seizure states:

---

P2d 541 (1986). Clearly, *Lee* is a vital component in modern Oregon search and seizure law.

[6] In *Oliver v. United States, supra,* 466 US at 180, Justice Powell wrote:

"The historical underpinnings of the open fields doctrine also demonstrate that the doctrine is consistent with respect for 'reasonable expectations of privacy.' As Justice Holmes, writing for the Court, observed in *Hester,* 265 US at 59, the common law distinguished 'open fields' from the 'curtilage,' the land immediately surrounding and associated with the home. The distinction implies that only the curtilage, not the neighboring open fields, warrants the Fourth Amendment protections that attach to the home. At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' and therefore has been considered part of home itself for Fourth Amendment purposes. Thus, courts have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private. Conversely, *the common law implies, as we reaffirm today, that no expectation of privacy legitimately attaches to open fields.*" (Emphasis supplied; footnotes and citations omitted.)

In *Katz v. United States,* 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967), Justice Harlan recognized that there is a difference between a "home," where a person has a constitutionally protected reasonable expectation of privacy, and a "field," where no such constitutionally protected interest exists. 389 US at 360-61 (Harlan, J., concurring). Notions of physical trespass based on the law of real property were not dispositive in *Katz* or in *Hester. See United States v. Knotts,* 460 US 276, 285, 103 S Ct 1081, 75 L Ed 2d 55 (1983).

.

> "*State v. Evans, supra,* 143 Or at 611, established as a matter of Oregon law that the 'inhibition against search and seizure does not extend to woods *or open fields* or public lands, such as a forest reserve.' " 1 *Criminal Law,* Oregon State Bar CLE Handbook 3-178 (1986). (Emphasis supplied.)

This court has consistently followed *Hester v. United States, supra.* In *State v. Brown,* 1 Or App 322, 325, 461 P2d 836 (1969), *rev den* (1970), we stated:

> "It is established in the law of search and seizure that an open-field investigation, even though the officers may be upon the private property of the defendant, is not unreasonable and is not cause for suppressing seized evidence."

We also followed *Hester* in *State v. Stanton,* 7 Or App 286, 490 P2d 1274 (1971). *See State v. Fondren,* 285 Or 361, 364, 591 P2d 1374, *cert den* 444 US 834 (1979). However, in *Stanton,* we mistakenly concluded that *Katz* had limited *Hester.* In *State v. Walle,* 52 Or App 963, 969, 630 P2d 377 (1981), we persisted in our error and overruled portions of *Stanton,* not because we had rejected *Hester,* but because we thought *Katz* had limited it.

I read *Lee, Evans* and *Brown* to have accepted *Hester* under Article I, section 9. I read *Stanton* and *Walle* to have limited *Hester* by superimposing a "reasonable expectation of privacy" analysis on it. Defendants essentially agree with my analysis of the relevant Oregon authorities. I would adhere to earlier state authority on the basis of *stare decisis.*

### Defendants' Argument

Defendants concede that these are "open fields" cases. They contend that the trial court erred in failing to follow "existing Oregon law regarding the 'open fields' issue." They argue that the evidence in this case must be suppressed if the area in which the marijuana was growing was a "constitutionally protected area" and that the test to determine whether the area is constitutionally protected is "whether the defendants had a reasonable expectation of privacy in such area." Thus, defendants ask this court to conduct a *Katz*-type analysis under Article I, section 9, which *Walle* suggests is the proper approach. The problem with their argument is that *Katz* did not modify *Hester's* "open fields" rule.

Defendants' reliance on *State v. Walle, supra,* and

*State v. Carter/Burton* 54 Or App 852, 856, 636 P2d 460 (1981), is misplaced. Those cases were decided under the Fourth Amendment, *see State v. Russo, supra* n 5, 68 Or App at 764 n 1, and, thus, they are superceded by *Oliver v. United States, supra.* They are not authority for defendants' interpretation of the Oregon Constitution.

Defendants have never argued that they were entitled to relief under Article I, section 9, because the deputies "trespassed" on their land.[7] The plurality provides no justification for reversing the trial court on a theory not raised in the trial court and not briefed or argued on appeal.

### Similarity of Texts

The "discovery" of unique individual rights in a state constitution should spring from a process that is reasonable and reasoned.[8] It should also reflect an intelligent awareness and assessment of federal experience. In determining whether independent state analysis is appropriate in this case, the similarity of the state and federal texts is a good starting point for inquiry. The text of Article I, section 9, is virtually identical with the corresponding text of the Fourth Amendment. *See* n 1, *supra.* The scope of both provisions is similar. *State v.*

---

[7] In *Oliver v. United States, supra,* 466 US at 183 n 15, the United States Supreme Court explained:

"The law of trespass recognizes the interest in possession and control of one's property and for that reason permits exclusion of unwanted intruders. But it does not follow that the right to exclude conferred by trespass law embodies a privacy interest also protected by the Fourth Amendment. To the contrary, the common law of trespass furthers a range of interests that have nothing to do with privacy and that would not be served by applying the strictures of trespass law to public officers. Criminal laws against trespass are prophylactic: they protect against intruders who poach, steal livestock and crops, or vandalize property. And the civil action of trespass serves the important function of authorizing an owner to defeat claims of prescription by asserting his own title. *See, e.g.,* O. Holmes, *The Common Law* 90-100, 244-246 (1881). In any event, unlicensed use of property by others is presumptively unjustified, as anyone who wishes to use the property is free to bargain for the right to do so with the property owner, *cf.* R. Posner, *Economic Analysis of Law* 10-13, 21 (1973). For these reasons, the law of trespass confers protections from intrusion by others far broader than those required by Fourth Amendment interests."

[8] *See* Linde, *E Pluribus—Constitutional Theory and State Courts,* 18 Ga L Rev 165 (1984); Carson, *"Last Things Last": A Methodological Approach to Legal Arguments in State Courts,* 19 Willamette L J 641 (1983); *but see* Maltz, *The Dark Side of State Court Activism,* 63 Texas L Rev 995 (1985); Deukmejian and Thompson, *All Sail and No Anchor - Judicial Review Under the California Constitution,* 6 Hastings Const L Q 975 (1979).

*Elkins,* 245 Or 279, 282, 422 P2d 250 (1966). Thus, the state text provides no basis for the plurality's analysis. *See State v. Flores, supra,* 280 Or at 280.

### Federal Authority

In construing the Oregon Constitution, we are not bound by federal interpretations of the Fourth Amendment. *State v. Kennedy, supra,* 295 Or at 265-68. We may adopt a higher standard under the Oregon Constitution than that enunciated by the United States Supreme Court. *State v. Caraher,* 293 Or 741, 750, 653 P2d 942 (1982); *Michigan v. Long,* 463 US 1032, 103 S Ct 3469, 77 L Ed 2d 1201 (1983). There is no *requirement* that we adopt a higher standard and, if we find United States Supreme Court decisions persuasive, we are free to align ourselves with them. *State v. Brown,* 301 Or 268, 274, 721 P2d 1357 (1986); *State v. Flores, supra; see State v. Campbell,* 299 Or 633, 648, 705 P2d 694 (1985) (adopting United States Supreme Court's reasoning in construing Article I, section 11, of the Oregon Constitution).

In *State v. Kennedy, supra,* Justice Linde explained:

"This court like others has high respect for the opinions of the [United States] Supreme Court, particularly when they provide insight into the origins of provisions common to the state and federal bills or rights rather than only a contemporary 'balance' of pragmatic considerations about which reasonable people may differ over time and among the several states." 295 Or at 267.

*See State v. Lowry,* 295 Or 337, 351, 667 P2d 996 (1983) (Jones, J., specially concurring).

In construing Article I, section 9, the Supreme Court generally has followed Fourth Amendment analysis. *See State v. Brown, supra,* 301 Or at 274; *State v. Kell,* 303 Or 89, 734 P2d 334 (1987); *State v. Smith,* 301 Or 681, 725 P2d 894 (1986); *State v. Sparklin,* 296 Or 85, 672 P2d 1182 (1983); *State v. Brown,* 291 Or 642, 661, 634 P2d 212 (1981) (Linde, J., concurring); *State v. Flores, supra; State v. Florance,* 270 Or 169, 527 P2d 1202 (1974); *see also State v. Flores,* 68 Or App 617, 619-26, 685 P2d 999, *rev den* 298 Or 151 (1984). When the Oregon Supreme Court has departed from federal authority in construing Oregon's Bill of Rights, it usually has provided a *principled* reason for doing so. *See, e.g., State v. Henry,* 302 Or 510, 732 P2d 9 (1987); *State v. Kock,* 302 Or 29, 725 P2d 1285

(1986); *State v. Kessler,* 289 Or 359, 614 P2d 94 (1980). In failing to explain in a *principled* manner its radical departure from recent federal authority directly on point, the plurality fails to show the "high respect for the opinions of the [United States] Supreme Court" that our Supreme Court repeatedly has stated should be shown. *See, e.g., State v. Kennedy, supra,* 295 Or at 267; *City of Portland v. Thornton,* 174 Or 508, 512, 149 P2d 972 (1942), *cert den* 323 US 770 (1944).

### Uniform Standard

Although the need for a uniform standard of law enforcement is not controlling, the Supreme Court has recognized that

"[T]o promote effective law enforcement, particularly when state and federal law enforcement agencies collaborate, and to further the orderly administration of criminal trials, there ought to be a uniform rule. We see no need to re-examine the position we took in [*State v. Florance, supra,* 270 Or at 184; *State v. Evans,* 258 Or 437, 442, 483 P2d 1300 (1971)]." *State v. Flores, supra,* 280 Or at 281.

Inexplicably, the plurality ignores this important consideration in departing from Oregon authority and from federal authority. *See* Howard, *State Courts and Constitutional Rights in the Day of the Burger Court,* 62 Va L Rev 873, 937 (1976) (state courts too rarely debate the need for national uniformity).

### Other States

Most of Oregon's Bill of Rights was taken *verbatim* from the Indiana Constitution (1851), which in turn had antecedents dating back at least to the time of the early state constitutions of the Revolutionary Era. Article I, section 9, of the Oregon Constitution is virtually identical to Article I, section 11, of the Indiana Constitution.[9] The Indiana Supreme Court has found that Article I, section 11, of that state's constitution is practically a reiteration of the Fourth

---

[9] Article I, section 11, of the Indiana Constitution (1851) provided:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

Amendment to the United States Constitution, *Applegate v. State,* 158 Ind 119, 124, 63 NE 16 (1902), and that it is but a reaffirmance of the rights of persons as they existed at common law. *Carey et al v. Sheets,* 67 Ind 375, 377 (1879). That is consistent with our Supreme Court's directive in *State v. Lee, supra,* that we construe Article I, section 9, in conformity with the common law. More importantly, the Indiana Supreme Court has held that Article I, section 11, of that state's constitution does not protect fields, woods or land some distance from a house or dwelling. *Williams v. State,* 201 Ind 175, 178, 166 NE 663 (1929). That is also consistent with our Supreme Court's holding in *Evans* that "the inhibition against search and seizure does not extend to * * * open fields." 143 Or at 611.

Other states have reached the same result under their state constitutions. In *Brown v. State,* 48 Ala App 84, 86, 261 So 2d 914 (1971), *aff'd* 288 Ala 732, 261 So 2d 919 (1972), the court stated:

> "It does not appear that the Appellate Courts of Alabama have ever extended the protection afforded by [Article I, section 5, of the Alabama Constitution] to open fields or pasture land beyond the curtilage of the home or business establishment. * * *.

> "Our research indicates that the present weight of authority, state and federal courts, supports the above cited cases. *See* 74 A.L.R. 1454 and 89 A.L.R.2d 780, for many cases collected on this subject. The states of Kentucky, Texas, Oklahoma, Indiana and Missouri hold to this view.

> "* * * * *

> "This court sees no good reason to depart from the time-honored understanding of the Bar and Courts that Article 1, § 5, Constitution of 1901 [sic] does not extend to open land outside of the curtilage, nor do we think that the framers of the Constitution of 1901 intended it to be so inclusive. We prefer to follow the rule laid down, *supra,* in the Federal Courts, * * *." (Citations omitted.)

In *The People v. Grundeis,* 413 Ill 145, 108 NE2d 483 (1952), the defendant claimed violations of both the state and federal constitutions because no warrant was obtained to search his real property. The Illinois Supreme Court stated:

> "[I]t is well settled that a search of open fields and other places

not within the curtilage of a dwelling falls outside the constitutional protection against unreasonable search and seizure. Thus, in *Hester v. United States, [supra,* 265 US at 59], Mr. Justice Holmes asserted, "* * * it is enough to say that, apart from the justification, the special protection accorded by the Fourth Amendment to the people in their "persons, houses, papers and effects," is not extended to the open fields.' * * * This ruling has been consistently followed under constitutions which, like those of Illinois and the Federal government, guarantee to the people security 'in their persons, houses, papers and effects' against unreasonable search and seizure." 413 Ill at 151. (Citations omitted.)

*See People v. Lashmett,* 71 Ill App 3d 429, 389 NE2d 888 (1979), *cert den* 444 US 1081 (1980).

In *State v. Seaton,* 679 SW2d 908, 909 (Mo App 1984), the Missouri Court of Appeals stated:

"Defendant's lone point relied on is that the trial court erred in admitting into evidence the samples of the marijuana seized from the five field patches because they were obtained under an unlawful search warrant in violation of defendant's right to privacy under the provisions of the Fourth and Fourteenth amendments to the Constitution of the United States and Art. I, § 15 of the Constitution of the state of Missouri. The 'open fields' doctrine permits police officers to enter and search a field without a warrant."

*See State v. Simpson,* 639 SW2d 230 (Mo App 1982).

In *State v. Havlat,* 222 Neb 554, 561, 385 NW2d 436 (1986), the Nebraska Supreme Court stated:

"Concerning the open fields doctrine, our state Constitution does not afford more protection than does the fourth amendment to the federal Constitution as interpreted in *Oliver v. United States, [supra*], and we decline to judicially impose higher standards governing law enforcement officers under the provisions of the state Constitution."

In *Beasley v. State,* 683 SW2d 132, 135 (Tex App 1984), the Texas Court of Appeals held:

"We hold that the language in Article I, Section 9 of the Texas Constitution is substantially similar to, and not more restrictive than, the language of the Fourth Amendment of the United States Constitution. Therefore, the Texas Constitution does not prohibit the application of the 'open field

doctrine' as described in *Oliver v. United States, [supra]* and *Goehring v. State,* 627 S.W.2d 159 (Tex.Cr.App.1982)."

Other states have followed *Hester's* analysis, although it is not always clear from reading the opinions whether a particular court was applying the federal or state constitution, or both. *See, e.g., Ford v. State,* 264 Ark 141, 142, 569 SW2d 105 (1978), *cert den* 441 US 947 (1979); *People v. Barbarick,* 168 Cal App 3d 731, 747 n 3, 214 Cal Rptr 322 (1985); *Kennemore v. State,* 222 Ga 252, 254, 149 SE2d 471 (1966); *Giddens v. State,* 156 Ga App 258, 259, 274 SE2d 595 (1980), *cert den* 450 US 1026 (1981); *Brent v. Commonwealth,* 194 Ky 504, 512, 240 SW 45 (1922); *Commonwealth v. Janek,* 242 Pa Super 340, 342, 363 A2d 1299 (1976). The plurality fails to cite a single case from any jurisdiction that supports its "trespass" analysis.

### Mischief Designed to be Guarded Against

The Fourth Amendment was directed against the use of general search warrants which were in use in New England at the time. *See United States v. Snyder,* 278 F 650 (ND W Va 1922). The requirement that all search warrants be specific is the heart of the Fourth Amendment.[10] Article I, section 9, was meant to embody the same principle as the Fourth Amendment and the state constitutions that preceded the federal Bill of Rights. *State v. Flores, supra,* 280 Or at 284-85 (Linde, J., dissenting). Thus, this case is not concerned with any of the mischief that Article I, section 9, was intended to curtail.

### Plurality Analysis

The plurality asks

"whether Article I, section 9, is concerned exclusively with the rights that it expressly mentions or whether it uses those

---

[10] In *United States v. Snyder, supra,* 278 F at 652, the court stated:

"[The Fourth Amendment] should be construed in the light of, and in conformity with, principles of the common law, with which the framers of the Constitution were familiar. * * *.

"* * * The second prohibition in the amendment was aimed against *general search warrants,* as had then been in vogue for many years prior to the noted Wilkes Case in 1776, when the validity of such warrants was questioned and brought to issue in the Court of King's Bench. That court held such warrants to be illegal and contrary to the principles of the English Constitution. * * *.

"*The Fourth Amendment to the Constitution contains no prohibition against arrest, search, or seizure without a warrant.* That was left under the rules of common law. (Emphasis in the original.)

rights as tools to achieve a broader purpose. That is, does the constitution protect property as property, or is its protection of property a means to a greater end?" 87 Or App at 6.

The plurality concludes:

"We believe it obvious that the constitution protects property in order to protect something more—one's personality or individuality—from official control. It does so by adapting traditional trespass law to create areas where officials may not go." 87 Or App at 6.

What is the authority for this novel reading of the Oregon Constitution? All we find is the plurality's *ipse dixit*.[11] Forgive me, but I cannot see "the emperor's new clothes." In holding

"that Article I, section 9, protects a person's right to exclude unwanted intrusions and unwanted methods of intruding from places and things over which that person has legitimate control. The right to exclude protects a person's secrecy and solitude," 87 Or App at 10,

the plurality has hopelessly confused constitutional law with the civil and criminal law of trespass.[12]

---

[11] When William Pitt, Earl of Chatham, spoke about the poorest Englishman's "cottage," he was asserting nothing more than the well-understood common law principle that every man's "house" is his castle. He was not speaking about "open fields," which did not enjoy special protection at common law.

The antecedent history of the Fourth Amendment has two principle sources: the colonists' antipathy for the general search warrant and the provisions in the early state constitutions designed to prevent general warrants. *See Note: Protecting Privacy Under the Fourth Amendment,* 91 Yale L J 313, 317 n 23 (1981). "Privacy" in the great outdoors was not a major consideration.

The suggestion that *State v. Duffy et al,* 135 Or 290, 297, 295 P 953 (1931), somehow extends the constitutional text, "effects," to *all* "property," including real property, has no support in text, history or authority. The *dictum* in *Duffy* cannot *amend* the constitution. *State v. Evans, supra,* decided in 1933, should be sufficient answer to the plurality's reference to *Duffy* as authority for its untoward conclusion.

*Anderson v. Fisher Broadcasting Co.,* 300 Or 452, 712 P2d 803 (1986), involved Article I, sections 8 and 10, of the Oregon Constitution. It is a civil tort case and it provides no support for the plurality's conclusion.

The student note, *supra,* 91 Yale L J 313, is a broadside attack on *Katz's* "reasonable expectation of privacy" analysis. The author's point appears to be that the United States Supreme Court should amend the Fourth Amendment by substituting the word "privacy" for the words "persons, houses, papers, and effects." The note, which was written several years before *Oliver v. United States, supra,* makes no reference to "open fields" or to the United States Supreme Court's ongoing adherence to *Hester.* The plurality's new definition of privacy to mean "secrecy and solitude," 87 Or App at 10, apparently comes from the note. *See* 91 Yale L J at 343.

[12] Article I, section 22, of the Alaska Constitution, Article II, section 10, of the

## Popular Demand

In extending constitutional protections beyond the explicit text of Article I, section 9, the plurality seeks to give "continuing life" to the state constitution. 87 Or App at 8.[13] If a state constitution is intended to "mirror" the fundamental values of each generation, it is abundantly clear that the overwhelming number of Oregonians would *not* favor a startling new construction of their state constitution that would "invent" a new protection for marijuana growers that only recently has been specifically rejected by the United States Supreme Court under the Fourth Amendment. One only needs to look back to the November, 1986, General Election when Ballot Measure 5, which would have legalized private possession and growing of marijuana for personal use, was soundly defeated at the polls, to gauge the sentiment of Oregonians toward any action, such as this, that will make the illegal production of marijuana in this state much easier. So much for the "felt necessities of the time." Holmes, *The Common Law* 1.

## Policy Considerations

The plurality provides no pragmatic or policy reasons demonstrating that its conclusion is reasonable. Where is the social science research documenting unique local conditions, such as widespread police misconduct infringing citizens' rights to be free from "unreasonable" searches and seizures, that would require a different rule under the state constitution? *See State v. Flores, supra,* 280 Or at 280. There is none. The spectre of platoons of jack-booted state storm-troopers assaulting the "open fields" of Oregon ferreting out evidence of criminal activity is simply unreal. *See State v. Smith, supra,*

Montana Constitution and Article I, section 5, of the Hawaii Constitution specifically protect "privacy." The plurality's analysis in this case might be plausible, *if* Article I, section 9, of the Oregon Constitution contained language similar to the "privacy" language in the Alaska, Montana or Hawaii Constitutions.

[13] The plurality's assertion that recognizing an "open fields" doctrine under Article I, section 9, would signal a "retreat" from basic constitutional principles is untenable. 87 Or App at 12. After all, Justice Holmes, who authored *Hester v. United States, supra,* Justice Douglas, who authored *Air Pollution Variance Bd. v. Western Alfalfa,* 416 US 861, 94 S Ct 2114, 40 L Ed 2d 607 (1974), which reaffirmed *Hester's* "open fields" doctrine, and Justice Powell, who authored *Oliver v. United States, supra,* have never been accused of being "insensitive" to basic constitutional principles.

301 Or at 699 (Oregon not a part of the country where physical brutality and violence exist).

The plurality's reference to "sophisticated technology and increasingly complex society which have developed in this century" is a "red herring." 87 Or App at 8. *No* technology was used in the challenged search.[14] Further, in the context of this case, the only thing that is "increasingly complex" about our society is the fact that illegal marijuana is reportedly Oregon's leading cash crop.

## Conclusion

Regrettably, a plurality of this court recognizes no obligation to base constitutional *rationales* on neutral principles. It substitutes its own social theories for the plain meaning of the specific constitutional text. Its result-oriented decisional process turns appellate review into a continuing constitutional convention. One well might ask, why do we need a *written* constitution at all if judges can "create" new rights where none previously existed and where neither text, history or authority support such discoveries? I reject the substitution of some other set of values for those that may be derived from the unambiguous text of the constitution and the assumed intent of its framers and ratifiers. Although judges are free to "interpret" the constitution, the people alone have the right to "amend" it. Article XVII, Constitution of Oregon.

Unprincipled judicial activism under the state constitution invites citizens to abandon their independent state guarantees in favor of entrusting their rights to federal law. *See State v. Kennedy, supra,* 295 Or at 270. It also undermines the effectiveness of state legislatures. "Privacy" is not the only value in society; we must balance degrees of it against other important values. Balancing competing values is preeminently a matter for the political process, not the courts, which are a poor substitute for the Legislature when it comes to examining the pros and cons of an issue and balancing competing values. In this case, for example, the theory on which this court has based its result was never raised in the

---

[14] Defendants do not attack the validity of the aerial surveillance. *See State v. Farkes,* 71 Or App 155, 161, 691 P2d 489 (1984), *rev den* 298 Or 704 (1985); *State v. Anspach,* 68 Or App 164, 682 P2d 786, *reversed on other grounds* 298 Or 375, 692 P2d 602 (1984); *State v. Bruno,* 68 Or App 827, 829, 683 P2d 1383, *rev den* 297 Or 824 (1984); *State v. Davis,* 51 Or App 187, 627 P2d 884 (1981).

trial court or on appeal. Rather, it sprang-forth, *sua sponte,* without input from the bench or bar, or from the public.

Professor Howard, one of our nation's foremost authorities on constitutional law, has cautioned:

"The case for an independent role for state courts should not be read as a case for unthinking activism. No judge, state or federal, is a knight errant, whose only concern is to do good. Hence, the state judge, when presented with the invitation to develop a body of state constitutional law, should pause to consider some of the dangers and hazards that may lie along the way." Howard, *State Courts and Constitutional Rights in the Day of the Burger Court, supra,* at 873.

Former Chief Justice Burger has noted:

"With our dual system of state and federal laws, administered by parallel state and federal courts, different standards may arise in various areas. But when state courts interpret state law to require *more* than the Federal Constitution requires, the citizens of the state must be aware that they have the power to amend state law to ensure rational law enforcement. The people of Florida have now done so with respect to Art I, § 12, of the State Constitution; they have it within their power to do so with respect to Fla Stat § 327.56 (1981)." *Florida v. Casal,* 462 US 637, 639, 103 S Ct 3100, 77 L Ed 2d 277 (1983) (Burger, C. J., concurring).[15]

In sum, I find no *principled* reason to apply Article I, section 9, to facts which, the plurality concedes, "are outside its literal language." 87 Or App at 8.[16] The plurality analysis is short on authority and long on policy-making—a prerogative

---

[15] In 1982, California voters amended their state constitution by an initiative election to provide that, except as provided by statute, relevant evidence not be excluded in any criminal prosecution. Cal Const, Art I, § 28(d) (1979, amended 1982).

[16] Even if the plurality's analysis is correct, I would not suppress the evidence. The trial court found, and defendants do not dispute, that the deputies, "acting in good faith, believed the [marijuana] plants to be on property owned by Rogge Lumber Company," and that the deputies "obtained consent from Rogge Lumber Company to seize any marijuana plants on their land." Notwithstanding the *dictum* in *State v. McMurphy,* 291 Or 782, 785, 635 P2d 372 (1981), which I conclude is unsound, *see State v. Holt,* 291 Or 343, 351-52, 630 P2d 854 (1981) (purpose of exclusionary rule is to deter unlawful police conduct), I would apply a "good faith exception" to the exclusionary rule in this case. *See California v. Carney,* 471 US 386, 105 S Ct 2066, 85 L Ed 2d 406 (1985); *Massachusetts v. Sheppard,* 468 US 981, 104 S Ct 3424, 82 L Ed 2d 737 (1984); *United States v. Leon,* 468 US 897, 104 S Ct 3405, 82 L Ed 2d 677 (1984); *see also People v. Barbarick, supra.*

most Oregonians understand to be reserved to the people. *See* Article IV, section 1, Constitution of Oregon.[17]

**ROSSMAN, J.,** dissenting.

I agree with the plurality that, as a general proposition, the protection afforded by Article I, section 9, of the Oregon Constitution against unreasonable searches and seizures extends beyond its literal terms. However, I also agree with the specially concurring opinion's criticism of the "analysis" offered by the plurality which, I believe, incorrectly assumes that we are presented with an open slate. Furthermore, I am seriously concerned about the removal of all notions of *reasonableness,* which has historically been the touchstone of Oregon search and seizure law, from the test to determine whether a search warrant is required to search real property under the circumstances of a particular case. In *State v. Walle,* 52 Or App 963, 630 P2d 377 (1981), we applied the "reasonable expectation of privacy" approach under circumstances very similar to this case. I would apply the same test here and hold that this record does not provide evidence of an objectively "reasonable expectation of privacy" as to the land on which the marijuana was discovered, even assuming that it is possible to manifest a constitutionally protected privacy interest in an open field.[1] Accordingly, I respectfully dissent.

The reasonable expectation of privacy test, as applied in *State v. Walle, supra,* is derived from Justice Harlan's concurrence in *Katz v. United States,* 389 US 347, 361, 88 S Ct 507, 19 L Ed 2d 576 (1967). As he explained it, a "reasonable expectation of privacy" encompasses two elements: (1) a subjective expectation of privacy that (2) is objectively reasonable. In other words, although an individual might have a

---

[17] Digby's motion to suppress should be denied for the same reason that the Dixsons lose. However, the plurality concludes that Digby was a "licensee whose rights in the [Dixsons'] land were greater than those of the officers." It cites no authority for that conclusion. The trial court expressly found that Digby had no ownership interest in, or right to possess, the Dixsons' land. That finding is supported by the record and we are bound by it. *State v. Warner,* 284 Or 147, 585 P2d 681 (1978); *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968).

[1] It may be that it is impossible to establish an objectively reasonable expectation of privacy in an open field. After all, both the public and the police are free to observe private property from the air. *See generally State v. Anspach,* 68 Or App 164, 682 P2d 786, *reversed on other grounds* 298 Or 375, 692 P2d 602 (1984).

subjective expectation of privacy in real property, that expectation—standing alone—is not enough to establish a constitutionally-protected privacy interest. Additionally, the individual's expectation of privacy must be objectively reasonable if it is to be one that society is willing to recognize.

With respect to real property, it is not, as the plurality holds, sufficient that the land in question is private property. Neither is it sufficient, as the special concurrence would hold, that the area is protected from public view by virtue of its topography or vegetation. In order to establish a constitutionally protected privacy interest, the owner of land must, at the very least, in some way affirmatively demonstrate that the public is not welcome on the land. Commonly employed means of conveying that message include erecting fences[2] and posting "No Trespassing" signs. Both actions imply one message: KEEP OUT! Defendants did nothing that would convey the kind of message that would assert a claim to privacy. Surely, "No Hunting" signs, such as they did post, do not say that hikers or other nonhunters are unwelcome. Similarly, making access roads impassable to motor vehicles is not evidence of an intent to deter foot traffic. As one officer testified, he had no intention of trespassing on the Dixson property. Rather, because there were no barriers to his free passage, he reasonably assumed that he was still on the property owned by Rogge Lumber Company.

Therefore, I would hold, under the facts of this case, that these defendants did not objectively manifest a reasonable expectation of privacy in the property searched, regardless of what might have been going on in their collective heads. It is unnecessary to sail into uncharted waters by formulating a new, untested constitutional analysis, as the plurality and special concurrence have done. It is also unnecessary to determine, as Judge Van Hoomissen would, whether there is an open fields "exception" to Article I, section 9, of the Oregon Constitution, analogous to that under the federal Fourth Amendment.

Deits, J., joins in this dissent.

---

[2] As we said in State v. Walle, supra, 52 Or App at 969: "Fences are not just to keep animals in; they are also a reasonable way of keeping humans out."