Argued and submitted September 4, 1996, decision of the Court of Appeals and order of the circuit court affirmed August 21, 1997

## STATE OF OREGON,
*Petitioner on Review,*

*v.*

## ROGELIO JUAREZ-GODINEZ,
*Respondent on Review.*

## (CC 92C-21343; CA A78977; SC S42584)

942 P2d 772

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause and filed the briefs for petitioner on review. With him on the briefs were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Helen Lenore Cooper, of Ferder, Brandt, Casebeer, Cooper, Hoyt and French LLP, Salem, argued the cause and filed the brief for respondent on review.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Graber, and Durham, Justices.

GILLETTE, J.

Van Hoomissen, J., dissented and filed an opinion.

## GILLETTE, J.

This is a criminal case in which defendant is charged with three counts of delivery of controlled substances (heroin, cocaine, and marijuana). The physical evidence in the case was seized pursuant to a search warrant. That warrant was obtained as a result of events that occurred after police stopped a car that defendant was driving. Those events included defendant's arrest on an unrelated charge, a 31-minute delay thereafter, and then an external "sniff" of the car by a trained dog, which led to discovery of drugs in the car.

Before defendant's trial, the trial court issued an order suppressing all evidence obtained from the car, concluding that the detention and the ensuing dog-sniff were an unconstitutional seizure followed by an unconstitutional search.[1] On the state's appeal, the Court of Appeals held that there had not been an unlawful detention, but affirmed on the ground that the dog-sniff violated defendant's rights under Article I, section 9, of the Oregon Constitution. *State v. Juarez-Godinez*, 135 Or App 591, 900 P2d 1044 (1995). We allowed the state's petition for review and now affirm, albeit on different grounds.

The following historical facts, taken from the trial court's findings, are supported by the evidence. At approximately 1:25 a.m. on October 13, 1992, Oregon State Police Trooper Burdick stopped defendant's car for exceeding the maximum speed limit. When Burdick approached defendant's car, he noted that defendant and his two passengers were Hispanic and well dressed and that the car contained a number of aromatic air fresheners and no visible luggage. He learned that the occupants were on their way to Tacoma. Defendant identified himself to Burdick (untruthfully) as "Oscar Sanchez." Defendant could not produce a driver license, but did give Burdick a temporary registration for the car.

---

[1] The trial court did not say whether it reached that conclusion under Article I, section 9, of the Oregon Constitution, the Fourth Amendment to the United States Constitution, or both.

Burdick ran a computer check on "Oscar Sanchez" and on the person named on the car's registration (who was not present). Burdick learned that there was an outstanding warrant for an Oscar Alverez-Martinez, aka Oscar Sanchez, and that the car's registered owner was on probation for delivery of a controlled substance. Burdick radioed for a backup officer and requested that Senior Trooper Milton and his drug-sniffing dog, "Bud," be summoned to the scene. Shortly thereafter, the requested backup arrived.

At that point (approximately 15 minutes after the initial stop) Burdick arrested defendant for failure to display a valid driver license and placed him in the rear of the police car. Burdick then asked defendant if he could search the car for drugs, weapons, or large amounts of money. Defendant refused to consent. After defendant and his passengers declined to consent to a search of the car, Burdick told them that "Officer Milton was going to come and sniff search the car, and if the dog alerted on the car that I would apply for a search warrant."

At 2:11 a.m., 46 minutes after the initial stop, Trooper Milton arrived with his dog. In the interim, the two passengers, who had been told neither that they were free to leave nor that they had to stay, remained in the vicinity. One of the passengers had a valid driver license, but neither passenger asked to be allowed to drive the car from the scene or to leave in any other way.

Upon Trooper Milton's arrival, Burdick again asked defendant if he could search the car. Defendant again refused to consent. Milton then allowed "Bud" to sniff the exterior of the car. The dog "alerted" at the lower left corner of the passenger door—behavior that, according to Milton, indicated that the dog had detected the odor of a controlled substance. Burdick had the car impounded and applied for a search warrant by an affidavit that reported the foregoing facts. The search warrant was issued and, in the ensuing search, the police discovered substantial quantities of drugs, which led to the present charges.

Defendant moved to suppress the drug evidence, arguing that it was the product of (1) an unlawful detention of the car that he had been driving and (2) a warrantless

search of the car, *viz.*, the dog-sniff, that was not supported by probable cause or reasonable suspicion. The trial court granted the motion on both grounds.

On the state's appeal, the Court of Appeals affirmed, concluding that the dog-sniff constituted an illegal search and that evidence obtained as a result of the dog-sniff therefore was properly suppressed. In so holding, the Court of Appeals first considered and then rejected the trial court's alternative basis for suppression—illegal detention of the car. *Juarez-Godinez*, 135 Or App at 595-97. Like the Court of Appeals, we deal first with that threshold issue because, if the trial court's ruling is correct in that respect, we need not consider the dog-sniff question.

In keeping with our traditional practice, we decide the question before us under the relevant provision of the Oregon Constitution, *viz.*, Article I, section 9. *See, e.g., State v. Campbell*, 306 Or 157, 162, 759 P2d 1040 (1988) (stating principle). At the same time, we note that the recent adoption by the people of Measure 40, a constitutional amendment, may cause a significant change in that practice. Several constitutional issues concerning the validity of Measure 40 have been argued to this court recently. However, we have chosen to dispose of this case before resolving those arguments, because the outcome of this case would be no different, whether or not Measure 40 were applied to it.

Not all governmental intrusions trigger the protections guaranteed by Article I, section 9, of the Oregon Constitution. *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986). Thus, in determining whether a particular governmental action violates Article I, section 9, of the Oregon Constitution,[2] we first must decide whether the action is either a "search" or a "seizure" within the meaning of that section. At

---

[2] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The text of the Fourth Amendment to the United States Constitution is the same in all material respects.

this juncture, we are concerned with what defendant asserts was a "seizure" of an *effect*, *i.e.*, a car that was lawfully in his possession.

■ Property is "seized," for purposes of Article I, section 9, when there is a significant interference, even a temporary one, with a person's possessory or ownership interests in the property. *Owens*, 302 Or at 207; *State v. Tanner*, 304 Or 312, 745 P2d 757 (1987). Beyond that rather spare definition, our cases do not offer much in the way of explanation: Although they clearly indicate that a "seizure" of property occurs when police physically *remove* property from a person's possession, *State v. Elkins*, 245 Or 279, 422 P2d 250 (1966), they have not dealt directly with nonphysical acts of interference with property.

■ We think, however, that our cases pertaining to seizures of *persons* are instructive.[3] Those cases indicate, for example, that, for purposes of Article I, section 9, "interference" with a person need not be accomplished by means of physical force, but may result from a mere show of authority. *State v. Warner*, 284 Or 147, 165-66, 585 P2d 681 (1978) (police seized defendant when they "asked" him to return to tavern and place identification on table). Our cases show, moreover, that a police officer has seized a person, for purposes of Article I, section 9, if that person *believes* that he or she has been seized and that belief is *objectively reasonable*. *See, e.g., State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991) (stating proposition);[4] *State v. Gerrish*, 311 Or 506,

---

[3] There is an obvious relationship between the two types of seizures that is reflected in their respective definitions. As discussed, we define seizure of an *effect* as a *significant* interference with an ownership or possessory interest. In a similar vein, we define seizure of a *person* as a *significant* interference with an individual's liberty of movement. *State v. Holmes*, 311 Or 400, 409, 813 P2d 28 (1991).

[4] In *Holmes*, the court said that a seizure of a person occurs under Article I, section 9, of the Oregon Constitution:

"(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable under the circumstances."

(Footnote omitted.)

511, 815 P2d 1244 (1991) (same). Finally, our seizure-of-person cases hold that any examination into whether an encounter between a police officer and a citizen constitutes a seizure is necessarily a "fact-specific inquiry into the totality of the circumstances of the particular case." *Holmes*, 311 Or at 408.

Those same precepts are helpful in determining when an *object* has been seized. Just as a *person* may be seized by a show of authority, so can a piece of property. Just as police conduct with respect to a *person* is tested according to what a defendant *did* believe and what an objectively reasonable person *would* believe under the circumstances, so is police conduct with respect to *property*. Finally, just as any determination as to whether a *person* has been seized necessarily involves a fact-specific inquiry, so does the determination as the whether an *object* has been seized.

With those principles in mind, we turn to the trial court's conclusion that defendant's car was unreasonably "detained," *i.e.*, "seized" in the constitutional sense. In reviewing that conclusion, we are bound by the trial court's factual findings, as long as those findings are supported by evidence in the record. *See Warner*, 284 Or at 156-57 (stating proposition); *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968) (same). Moreover, if the trial court failed to articulate expressly a factual finding on some pertinent issue, we will assume that the facts were decided in a manner consistent with the court's ultimate conclusions, as long as there is evidence in the record, and inferences that reasonably may be drawn from that evidence, that would support such a resolution. *See State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993) (stating proposition); *Warner*, 284 Or at 156-57 (same).

Indisputably, defendant had been placed under arrest. As a consequence of that arrest, defendant was unable to drive the car away himself. Still, he retained a possessory interest in the car and, in normal circumstances, could have transferred possession of it to one of his passengers and directed that it be driven away.[5] Indeed, Burdick's request that defendant consent to the search at least arguably was a

---

[5] Certainly, there was no *legal* barrier to such an outcome: At least one of the passengers held a valid driver license.

recognition of defendant's possessory interest, and defendant's refusal to allow Burdick to search was an effort to exercise that possessory interest.

The question, then, is whether there is evidence in the record to support a conclusion that Burdick interfered in some significant way with defendant's possessory interest. We think that there is. In particular, there is evidence that Burdick told defendant and his companions, after Burdick was denied permission to search, that another officer and his dog were coming to check the car. Burdick's statements were *and* reasonably could have been interpreted as curtailing, by a show of authority, defendant's rights to transfer possession of, and direct the movements of, the car.

In view of the surrounding circumstances, a trier of fact reasonably could infer that, regardless of defendant's wishes, Burdick was not going to allow the car to leave until Milton and his drug-sniffing dog arrived. A trier of fact also could infer from the fact that defendant did *not* ask if his companions could drive the car away (at a time when such inaction clearly was contrary to his self-interest) that defendant had *interpreted* Burdick's statement as foreclosing that option.[6] If the trial court, as trier of fact, did so find (and our standard of review, stated above at 7, requires us to assume that it did), then the car had been seized in the constitutional sense—by actually curtailing defendant's right to direct the car's movements or, at the very least, by causing defendant reasonably to believe that that right had been curtailed.

Having ascertained that the automobile was, in fact, "seized," we must determine whether that seizure offended Article I, section 9, of the Oregon Constitution. We have stated, on various occasions, that a warrantless seizure is

---

[6] Of course, a different inference might be drawn from defendant's inaction, *i.e.*, that defendant failed to ask for the car's release because he did not wish to or think to have the car driven away. In holding that a seizure did not occur, because defendant and his companions never asked to have it released, the Court of Appeals appears to have relied on that very inference. *State v. Juarez-Godinez*, 135 Or App 591, 597, 900 P2d 1044 (1995). But, because a legitimate alternative inference supports the trial court's ultimate conclusion (that defendant believed that making such a request would be futile), we must assume that the trial court drew that inference.

unconstitutional unless it is justified under one of a few carefully circumscribed exceptions to the warrant requirement. *See, e.g., State v. Kosta*, 304 Or 549, 553, 748 P2d 72 (1987) (so stating). We do not find that any exception applies to the circumstances in this case. We conclude that the seizure of the car was invalid.[7]

■ One final question remains: Does the fact that the car was unlawfully *detained* compel the suppression of evidence discovered in a subsequent *search* of the car? In other words, was that evidence a product of the unlawful detention? *See Pooler v. MVD*, 306 Or 47, 52, 755 P2d 701 (1988) (unlawful stop may invalidate an ensuing arrest, but only through the exclusion of evidence garnered from the stop).

■ Unquestionably, it was. As a result of the unlawful detention, the police were able to subject the car to a dog-sniff that, in turn, was used to obtain a search warrant. Without the evidence garnered from the detention, any application for a search warrant could have been supported only by Burdick's observations of circumstances that, however much they may have piqued his curiosity, were relatively unremarkable: (1) defendant and his companions were Hispanic and expensively dressed, (2) the car's occupants were making a long trip with no visible luggage, (3) the car was owned by a drug offender, (4) defendant was "visibly nervous" and unable to produce identification, and (5) the car smelled of aromatic air fresheners and was registered to a third party who was on probation for delivery of a controlled substance. Even when viewed through the filter of Burdick's training and experience, those observations did not amount to *probable cause* and were, consequently, insufficient to support the issuance of the search warrant. *Cf. State v. Valdez*, 277 Or 621, 628, 561 P2d 1006 (1977) (in the absence of any very

---

[7] The dissent takes a different view of both the facts and the law. As to the facts, it may be that the evidence is such that the trial judge could have made findings that accord with the dissent's view. The point, however, is that the judge did not do that. *See, e.g., State v. Warner*, 284 Or 147, 156-57, 585 P2d 681 (1978) (assumption is that facts were found consistent with trial court's ultimate legal conclusion, where evidence would support such findings). Moreover, it does not appear to us that the state, which lost at trial, argued to the Court of Appeals the legal theory on which the dissent now relies. The state is not entitled to prevail on that theory now. *See, e.g., State v. Hickmann*, 273 Or 358, 540 P2d 1406 (1975) (illustrating proposition).

remarkable activity, police officer's instinct and experience cannot, by themselves, justify stop).[8]

We conclude that Burdick's detention of defendant's car until it could be sniffed by "Bud" amounted to a seizure, that the seizure violated Article I, section 9, of the Oregon Constitution, and that the evidence that was obtained in the subsequent search of defendant's car pursuant to a search warrant was a product of that unlawful seizure.

Although the question is a close one, it does not appear to us that the result in this case would be different under the Fourth Amendment. Although the United States Supreme Court holds that investigative detentions of personal property *can* be constitutionally valid, *United States v. Place*, 462 US 696, 706, 103 S Ct 2637, 77 L Ed 2d 110 (1983), the facts arousing the officer's suspicions here were too minimal, and the duration of the seizure too lengthy, to meet the requirements of the *Place* rule. *Compare United States v. Sokolow*, 490 US 1, 10-11, 109 S Ct 1581, 104 L Ed 2d 1 (1989) (fact that the defendant bought two airplane tickets for total of $2,100 from roll of $20 bills, traveled under name different from that listed for his telephone number, was headed for Miami a source of illegal drugs, traveled for 10 hours from Honolulu, to stay in Miami for 48 hours, appeared nervous, and did not check his luggage supported a reasonable suspicion of wrongdoing).

We hold that the trial court's order suppressing evidence was, on the facts found by that court, constitutionally correct under both state and federal constitutions. The Court of Appeals decision thus reached the right result.[9]

---

[8] The state argues that, in order to conclude that the drug evidence was obtained *as the result* of the unlawful action, we must find affirmative evidence in the record showing that defendant's companions would have driven the car elsewhere *but for* Officer Burdick's actions. We disagree. Not only does that proposition erroneously relieve the state of its burden of proving that the warrantless seizure of the car was justified, it does so by reviving a factual issue that we already have addressed. As we have stated earlier in this opinion, the trial court was entitled to infer (and we assume that the trial court did infer) from defendant's inaction that defendant believed that the car had been seized and that requesting its release would have been futile. Insofar as Burdick's actions provided the basis for that belief, they *resulted in* defendant's inaction and, consequently, in the car's continuing presence at the scene.

[9] Because we determine that the police impermissibly seized defendant's car, we need not decide whether the use of "Bud" during that seizure was a search for constitutional purposes.

The decision of the Court of Appeals is affirmed. The order of the circuit court is affirmed.

**VAN HOOMISSEN, J.,** dissenting.

I respectfully dissent.

I would hold that (1) Trooper Burdick did not seize the car before the dog-sniff; (2) even if Burdick seized the car before the dog-sniff, the seizure was justified by his reasonable and articulable suspicion that the car was being used to transport contraband; (3) a dog-sniff is not a search for state constitutional purposes; (4) Burdick's affidavit established probable cause to search; and (5) even if Burdick violated Article I, section 9, after the enactment of Measure 40, Article I, section 9, may not be construed more broadly than the Fourth Amendment and that suppression is not warranted by the Fourth Amendment.

The relevant facts are undisputed. At the outset, it is important to identify what defendant does not challenge. He does not challenge the validity of the stop for exceeding the maximum speed, the validity of his arrest for failure to display a driver license, or the duration of his continued detention after his arrest and during the period that the troopers were trying to determine his true identity. He does not argue that the stop was a pretext for the investigation of a more serious crime.[1]

It also is helpful to the analysis to identify what the state does not argue. The state does not argue that Burdick could search the car because he feared for his safety, that he was authorized to search the car incident to arrest, that he was authorized to search pursuant to the "automobile exception" to the warrant requirement, or that the evidence inevitably would have been discovered after the car was impounded.

---

[1] *See Whren v. United States*, 517 US ___ , 116 S Ct 1769, 135 L Ed 2d 89 (1996) (if the police lawfully could have stopped a person for a traffic infraction, it does not matter that they actually stopped the person to investigate a crime for which they had little or no evidence).

The trial court made the following findings of fact:

"The Defendant was stopped on October 13, 1992, at approximately 1:25 a.m. for what appeared to be a routine traffic stop for exceeding the maximum speed limit. The Defendant's vehicle did not stop immediately upon seeing Trooper Burdick's overhead lights, but did pull off at the first exit ramp that the vehicle came to. Upon making contact with the driver, Trooper Burdick noted that all of the occupants in the vehicle were hispanic, that the Defendant was the driver of the vehicle, and that there was a female passenger in the front passenger seat and a male passenger in the back seat behind the front passenger. Trooper Burdick also observed that there were numerous air fresheners in the vehicle and that there was no luggage visible in the vehicle. Trooper Burdick also noted that the occupants were nicely dressed and that the Defendant had 'salon styled hair.' When asked where they were going to, the occupants told Trooper Burdick that they were on their way home to Tacoma, that they had been visiting a relative in Eugene. When the driver was asked for his driver's license, he was not able to produce one and gave Trooper Burdick the name of Oscar Sanchez. When asked to produce the registration for the vehicle, the Defendant produced a temporary registration in the name of a person who was not present. When a computer check was done on the registered owner, Trooper Burdick was told that the registered owner was on parole. A computer check on the name of Oscar Sanchez revealed that there was an outstanding warrant for Oscar Alverez-Martinez, aka Oscar Sanchez, with a date of birth of September 28, 1971.

"Trooper Burdick then re-contacted the Defendant and advised him about the warrant. The Defendant then told Trooper Burdick that the Defendant's name was Oscar Sanchez-Sanchez and that he had never been arrested and was not the person described on the warrant. During this time, Trooper Lewis had arrived at the scene and primarily acted as backup for Trooper Burdick. Trooper Burdick also contacted dispatch and requested that Senior Trooper Milton and his canine, 'Bud,' respond to the scene. After discussing the outstanding warrant with the Defendant, Trooper Burdick then placed the Defendant under arrest for failing to display a driver's license. Approximately 15 minutes had elapsed since the initial stop at this time. Defendant was

handcuffed and placed in the rear of Trooper Burdick's patrol vehicle.

"Trooper Burdick then contacted the Defendant in the Trooper's patrol car and advised him that they were having a problem with people trafficking in narcotics on the highways, and Trooper Burdick asked the Defendant if the Defendant had any drugs, weapons or large amount of money in the Defendant's vehicle. The Defendant told Trooper Burdick that he did not. The Defendant refused several requests by the Trooper to search the vehicle. The occupants of the vehicle were not told they were free to leave, even though the female passenger had what appeared to be a valid Washington driver's license and the computer check on her revealed 'no wants.' The occupants of the vehicle never asked to leave, nor did they ask if they could drive the vehicle from the scene.

"Trooper Milton and his dog arrived at the scene at 2:11 a.m., approximately 46 minutes after the initial stop for the traffic violation. Trooper Milton contacted the driver of the car and was again refused consent to search the vehicle. Bud, the dog, was then allowed to sniff the outside of the vehicle and 'alerted' on the crack of the lower left corner of the passenger door. Trooper Milton determined that Bud was reacting to the odor of controlled substances. The occupants of the vehicle were again contacted and permission was requested to search the vehicle. The occupants again refused to grant consent to search the vehicle.

"A search warrant was subsequently obtained for the search of the vehicle based on the above information. Neither the Defendant, nor the occupants of the vehicle were informed that they were free to leave the scene of the stop until after the dog search was complete. Trooper Burdick testified that he could have impounded the vehicle prior to the dog search if he had not been able to verify with the registered owner that the occupants had permission to use the vehicle. He also testified that he did not attempt to contact the registered owner of the vehicle. Trooper Burdick also testified that he was not aware of any statute authorizing him to impound the vehicle, but that it was their office policy to do so if the registered owner could not be located to verify permission to use the vehicle."

The record also contains additional undisputed facts pertinent to this case. During the course of his experience as

a state trooper, Burdick was involved in about 100 arrests involving narcotics. He had training and on-the-job experience in the investigation of narcotics and narcotics-related crimes including methamphetamine, LSD, heroin, cocaine, and marijuana. His training included the identification, methods of use, sales, possession, manufacture, and delivery of controlled substances, as well as the common characteristics of persons involved in the sale, possession, delivery, and transportation of controlled substances.

On first observing the car defendant was driving, Burdick activated his overhead lights and followed it for about one mile at 75 mph. The car slowed down to about 40 mph, but did not immediately stop. The car eventually pulled off the freeway and stopped. Burdick testified that he suspected that the driver was considering whether to stop or to elude and that the occupants were hiding something in the car.

Burdick told defendant that he had been stopped for speeding. Defendant stated that he and his passengers were en route from Eugene, Oregon, to Tacoma, Washington. From his training and experience, Burdick knew that Tacoma is a frequent destination of narcotics traffickers. When asked the significance of his observation that there was no luggage in the passenger compartment of the car, Burdick testified that he thought it was strange that three adults who had traveled from Tacoma to Eugene, and who had spent several nights there, had no luggage in the passenger compartment of the car. Burdick further testified that, in his experience, the presence of numerous air fresheners in the car indicated that the occupants "were trying to hide the odor of something in the car," and that "usually, one air freshener is more than ample to keep your car in fresh odor."

Defendant identified himself to Burdick as "Oscar Sanchez." When Burdick asked defendant for his driver license, defendant stated that he had a California driver license, but that it was at home in California. Defendant had no other identification. A computer check by Burdick revealed that no California driver license had been issued under the name "Oscar Sanchez." When confronted with that

fact, defendant changed his story, stating that it was a passenger that had a California license, not him. Defendant then told Burdick that his name was Oscar Sanchez-Sanchez.

The driver gave Burdick a temporary registration for the car in the name of Pablo Santiago-Ruiz (who was not present). The computer revealed that Pablo Santiago-Ruiz was on parole in Lane County for delivery of a controlled substance, and that the male passenger in the car had a record for a narcotics offense. Burdick knew from his training and experience that it is common for one person to provide drugs and a car for transporting drugs and for a different person to act as a drug courier. Based on his observations and experience, Burdick suspected that the car was being used to transport narcotics. Burdick radioed for a "backup," and requested that Senior Trooper Milton and a drug-sniffing dog come to the scene. Trooper Lewis, the requested backup, arrived soon thereafter.

At about 1:40 a.m., Burdick cited defendant for speeding, arrested him for failure to display a driver license, and placed him in the rear of Burdick's car. Burdick then asked defendant if he could search the car for controlled substances, large amounts of money, or weapons. Defendant became agitated and visibly nervous, turning pale, perspiring, and exhibited furtive eye movements. Defendant refused to consent, explaining that he was not the owner of the car. When questioned about the presence of controlled substances in the car, the female passenger exhibited signs of nervousness. She became very defensive, stating that, "if there was any drugs hidden in the car, she would not know about it." Burdick then told defendant and the passengers that Milton was en route with a drug-sniffing dog and that, if the dog "alerted" on the car, Burdick would apply for a search warrant.

While Burdick waited for the dog, the passengers remained "milling around the area." They were not under arrest. They did not ask to leave. They were not told that they could not leave. Neither passenger asked to be allowed to or attempted to drive the car away. Defendant did not ask that either of his passengers be permitted to move the car. There is no evidence in the record that either passenger had any

authority from defendant or from the owner of the car to drive it away. Burdick testified at the hearing that, if a request had been made, and assuming that the registered owner had been contacted and had consented, he would have permitted the passengers to drive the car away. Burdick also testified that, if defendant had asked him to attempt to contact the car's registered owner for permission to release the car to the passengers, he would have attempted to do so. No one asked Burdick to attempt to contact the registered owner. The police did not move the car.

At about 2:11 a.m., 31 minutes after Burdick had arrested defendant, Milton arrived with his dog. Milton brought a photograph of Oscar Sanchez. On comparing defendant to the picture, the troopers determined that defendant was not the wanted man. Milton asked defendant if he could search the car. Defendant again refused to consent. Milton then allowed the dog to sniff the outside of the car. The dog sniffed odors wafting out of the car's partially open windows. No part of the dog entered the car. The dog "alerted" at the lower left corner of the passenger door— behavior that indicated to Milton that the dog had detected the odor of a controlled substance. Burdick again asked defendant for consent to search, which again was denied.

Burdick then impounded the car and applied for a search warrant supported by an affidavit that reported the foregoing facts.[2] The search warrant was issued and, in the ensuing search of the car, the troopers discovered 111 grams of cocaine, 50 grams of tar heroin, and three and one-half pounds of marijuana, which led to the present charges.

Before trial, defendant moved to suppress the evidence on the ground that the search was "unconstitutional." Defendant's motion cited no specific state or federal constitutional provision.[3] Defendant argued that the troopers lacked reasonable suspicion to believe that there were drugs, weapons, or cash in the car, that, if the troopers had such

---

[2] After the car was impounded, Trooper Lewis gave defendant's passengers a ride to Salem.

[3] At the suppression hearing, Troopers Burdick and Milton testified for the state. Defendant did not testify, called no witnesses, and offered no other evidence.

reasonable suspicion, the car was detained for an unreasonable length of time, and that the dog-sniff was not supported by probable cause. Accordingly, the court granted defendant's motion to suppress. The trial court concluded that Burdick had seized the car unlawfully and that the dog-sniff was an unlawful warrantless search. The trial court's order did not cite any specific state or federal constitutional provision, and the legal basis of the court's opinion is not entirely clear.

The Court of Appeals, sitting in banc, unanimously agreed that the trial court erred in concluding that the car was detained unlawfully. *State v. Juarez-Godinez*, 135 Or App 591, 597, 900 P2d 1044 (1995).

Notwithstanding that holding, the court affirmed the trial court's suppression order, concluding that the "under these circumstances, the use of [a drug-sniffing dog] to reveal the contents of defendant's vehicle constituted a search under Article I, section 9." *Id.* at 604-05. Moreover, the Court of Appeals concluded that "[e]ven assuming that a reasonable and articulable suspicion of drug activity would be sufficient to justify a warrantless dog-sniff search of a lawfully stopped vehicle, the evidence does not support such a suspicion here." *Id.* at 606. Judge Edmonds, joined by Judge Riggs, dissented. They concluded that a dog-sniff is not a search within the meaning of Article I, section 9, because there is no significant privacy interest in odors that have escaped from containers in a parked automobile in a public place. *Id.* at 608 (Edmonds, J., dissenting).

On review, the majority of this court holds that the car was seized before the dog-sniff, in violation of Article I, section 9, 326 Or at 8-9, and that the evidence discovered later pursuant to a search warrant was the product of that unlawful seizure. 326 Or at 9-10. I disagree. I agree with the unanimous conclusion of the ten Court of Appeals' judges that the car was *not* seized for state constitutional purposes before the dog-sniff. *Juarez-Godinez*, 135 Or App at 597.

## THE CAR WAS NOT SEIZED

To support its conclusion that Burdick seized the car by "significantly interfering" with defendant's possessory

interest in the car, the majority relies primarily on Burdick's statement that Milton was en route with the dog. That statement, the majority contends, coupled with other "surrounding circumstances," could lead a trier of fact reasonably to infer that, by a "show of authority," Burdick had taken control of the car.

However, the majority overlooks the fact that, both before and after the arrival of Milton and the dog, the troopers asked defendant and his passengers for consent to search the car and that, on each occasion, the troopers had respected the refusal to consent. The refusal of consent certainly indicates that defendant and his passengers assumed that they retained control of the car. Moreover, the troopers' conduct is inconsistent with a conclusion that Burdick exercised control over the car in such a way as to significantly interfere with defendant's possessory interest, or that defendant had somehow submitted to Burdick's asserted show of authority. Nothing in the record remotely suggests that defendant believed that Burdick had seized the car or that, in view of the totality of the circumstances, such a belief would have been objectively reasonable.

To conclude that Burdick's statement about the impending arrival of the dog had a meaningful impact on defendant's understanding about the degree of control that he could exercise over the car, one also would have to conclude that, before Burdick's statement, defendant was poised and determined to exercise authority over the car by asking one of the passengers to drive it away. However, common sense suggests that defendant and his passengers would *not* have wanted to remove the car. For example, if defendant had asked the passengers to drive away and, knowing that the car contained narcotics, they had refused, that refusal would have heightened Burdick's suspicion that the car was being used to transport contraband. Moreover, the passengers would be reluctant to drive the car away fearing that the troopers might again stop them to inquire about narcotics activity.

One can only wonder what the majority thinks troopers charged with the duty to enforce the state's drug laws should have done under the circumstances presented

here. The majority's reliance on Burdick's statement to defendant about the impending arrival of the dog apparently means that if Burdick had said nothing to defendant about Milton and the dog, the result in this case would be different. The majority's message to the police, therefore, appears to be: "Say nothing!"[4]

In sum, as did the Court of Appeals, I would hold that Burdick did not seize the car before the dog-sniff. Because there was no seizure, it is unnecessary to determine whether Burdick had a reasonable and articulable suspicion that defendant was using the car to transport contraband.

## DETENTION WAS JUSTIFIED BY REASONABLE SUSPICION

Even if Burdick seized the car for purposes of Article I, section 9, before the dog-sniff, I would hold that Burdick had a reasonable and articulable suspicion to believe that defendant was using the car to transport contraband.[5] Therefore, he was authorized to detain the car for a reasonable period of time for investigatory purposes. *See State v. Dominguez-Martinez*, 321 Or 206, 212, 895 P2d 306 (1995) (if, during the course of a lawful stop, a police officer develops a sufficient basis to stop a person on suspicion of an unrelated crime, the officer may continue the stop on that basis); *State v. Nagel*, 320 Or 24, 33, 880 P2d 451 (1994) (traffic infraction stop lawfully converted to investigation for driving while intoxicated); *State v. Ehly*, 317 Or 66, 80, 854 P2d 421 (1993) (whether the suspicion is reasonable often will depend on the inferences drawn from the particular circumstances confronting the officer, viewed in the light of the officer's experience); *State v. Valdez*, 277 Or 621, 628, 561 P2d 1006 (1977)

---

[4] Of course, that would appear to violate the admonition of the United States Supreme Court in *United States v. Place*, 462 US 696, 710, 103 S Ct 2637, 77 L Ed 2d 110 (1983), that the police should not fail to accurately inform a detainee as to the expected course of an investigative detention.

[5] The Court of Appeals recognized that, among the state courts that have concluded that a dog-sniff is a search, the trend is to hold such searches to a standard no more exacting than reasonable and articulable suspicion that the property to be searched contains contraband. *State v. Juarez-Godinez*, 135 Or App 591, 606, 900 P2d 1044 (1995). My research has failed to find a single case, state or federal, in which a standard higher than reasonable and articulable suspicion has been deemed applicable to a dog-sniff of property not physically taken from a person claiming a possessory interest in the property.

(reasonable suspicion standard is less than the standard for probable cause).

Applying the reasonable suspicion standard to the evidence in this case, the specific and articulable facts that supported Burdick's suspicion that the car was being used to transport contraband are:

1. Defendant did not stop the car immediately on seeing the flashing overhead lights on Burdick's car. In Burdick's experience, "[u]sually vehicles pull right over." The car eventually slowed to about 40 mph, but did not stop until after about a mile, indicating to Burdick that the driver was considering whether to stop or to elude and that the passengers were hiding something in the car;

2. Burdick stopped defendant at 1:25 a.m. in a remote location. From his training and experience, Burdick knew that "people who are trying to transport narcotics usually travel in early morning hours";

3. Defendant told Burdick that he and his passengers were driving to Tacoma, which Burdick knew to be a frequent destination of narcotics traffickers;[6]

4. Despite the fact that defendant and the passengers of the car stated that they had been visiting relatives in Eugene for several days, Burdick observed no luggage in the passenger compartment of the car;

5. The presence of several air fresheners in the car indicated to Burdick that the occupants were trying to hide the odor of something in the car;

6. Defendant told Burdick conflicting stories about his identity. Defendant first told Burdick that his name was "Oscar Sanchez." A computer check revealed an outstanding warrant for narcotics on a person named Oscar Alverez-Martinez, aka Oscar Sanchez, matching defendant's description;[7]

---

[6] In *United States v. Sokolow*, 490 US 1, 3, 109 S Ct 1581, 104 L Ed 2d 1 (1989), the United States Supreme Court took into consideration that the defendant's destination was a "source city" for illicit drugs. Other state and federal cases likewise consider it significant that the detainee (or his or her property) are coming from or going to a "source city." If Burdick knew that Tacoma was "a frequent destination of narcotics traffickers," he was justified in relying on that knowledge.

[7] The fact that defendant was determined later not to be the wanted man does not negate Burdick's reasonable belief that a warrant existed for defendant's

7. Defendant was unable to produce a driver license or any other identification;

8. Defendant told Burdick conflicting stories about his driver license;

9. The registered owner of the car, who was not present, was on parole in Lane County for delivery of a controlled substance. Burdick knew that it is common for one person to provide drugs and a car for transporting drugs and for a different person to act as a drug courier. Burdick also stated that, in every one of the 35 arrests he had made for transporting drugs, the car involved was registered to a third person;

10. A passenger in the car had a record for a narcotics offense;

11. When Burdick asked defendant for consent to search the car, defendant became "visibly nervous, turning pale, agitated, perspiring, and exhibited furtive eye movements." The only reason that defendant gave for denying consent was that he was not the owner of the car;

12. Burdick had made about 35 traffic stops during which the driver had exhibited the same or similar characteristics as defendant in this case. In every one of those cases, after a consent search, Burdick found controlled substances in the car;

13. When questioned about the presence of controlled substances in the car, the female passenger "exhibited signs of nervousness. She became very defensive, stating that if there were any drugs hidden in the car, she would not know about it."

The trial court discounted Burdick's observations that all the occupants of the car were wearing newly purchased clothing, that defendant was wearing a gold necklace, a gold ring, and had "salon-styled" hair as inappropriate facts to be considered in a reasonable suspicion analysis. However, if Burdick knew from his training and experience that drug dealers often live a flamboyant lifestyle, it is not clear to me why it was inappropriate for him to rely, in part, on those

arrest. *Cf. Arizona v. Evans*, 514 US 1, 115 S Ct 1185, 131 L Ed 2d 34 (1995) ("good faith" exception to the exclusionary rule applied to computer errors).

observations. Assuming that it is impermissible for the police to infer an incriminating fact based solely on a person's dress and grooming, that certainly does not suggest that lifestyle information may *never* be taken into account. *See Ehly*, 317 Or at 80 (police may develop reasonable suspicion based on facts that might appear innocuous to a lay person).

The Court of Appeals discounted Burdick's knowledge that several of the people involved here had prior adverse contacts with law enforcement involving drug offenses. *Juarez-Godinez*, 135 Or App at 607. I fail to understand why it was impermissible for Burdick to rely, in part, on that knowledge. Is it not more likely that people with a history of prior narcotics activity will be involved in current narcotics activity?

The Court of Appeals also rejected the state's argument that Burdick had a reasonable and articulable suspicion that defendant may have been transporting contraband on the ground that Burdick's "instincts and experience" could not form the entire basis of reasonable suspicion. *Id.* at 607. Of course, reasonable suspicion may not be based entirely on an officer's "instincts and experience," *i.e.*, on a "hunch." In this case, however, Burdick's suspicion was not based solely on his instincts and experience. Rather, it was based on more than a dozen specific and articulable facts known to Burdick, as well as on his experience and training.

The majority finds that the facts arousing Burdick's suspicions here were "too minimal." I disagree. The totality of the circumstances show that defendant fit a "drug courier profile."[8] If the totality of the facts known to Burdick did not give him a reasonable suspicion to believe that defendant may have been transporting contraband, it would be difficult to imagine what additional facts short of probable cause would do so. In *United States v. Sokolow*, 490 US 1, 9-10, 109 S Ct 1581, 104 L Ed 2d 1 (1989), the court explained that multiple factors, all of which might be consistent with innocent

---

[8] The facts in this case are similar to those in *United States v. McFarley*, 991 F2d 1188, 1192-93 (4th Cir), *cert den* 510 US 949 (1993), where the court found reasonable suspicion to detain luggage for 38 minutes when the individual arrived from a drug-source city, matched the drug-courier profile, acted in a nervous manner with the police, and relayed stories with discrepancies to officers.

travel, when taken together may give rise to reasonable suspicion. *See also United States v. Sharpe*, 470 US 675, 682 n 3, 105 S Ct 1568, 84 L Ed 2d 605 (1985) ("Perhaps none of these facts, standing alone, would give rise to a reasonable suspicion; but taken together as appraised by an experienced law enforcement officer, they provided clear justification to stop the vehicles and pursue a limited investigation.").

In making a determination of reasonable suspicion, the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts. *Sokolow*, 490 US at 9-10. Reasonable suspicion must be evaluated based on the information that is available to the officer under the circumstances in which the decision must be made. *Ehly*, 317 Or at 80; *see also State v. Lichty*, 313 Or 579, 585, 835 P2d 904 (1992) (officer was obligated to make snap decision to arrest based solely on informant's statement that defendant's wallet had "a bag of coke" in it).

The majority also concludes that the duration of the seizure was "too lengthy." I disagree. The only time period that properly may be challenged is the time after defendant was arrested and before the dog-sniff, *i.e.*, about 31 minutes. During that time, the troopers diligently pursued their investigation of the car and, by using the dog, took steps to minimize the intrusion on defendant's privacy. Burdick correctly informed defendant as to the expected course of the investigation. Defendant offered *no* evidence that the troopers were dilatory in their investigation. Defendant does not argue that there was a less invasive course of conduct available to Burdick. Thus, the circumstances were quite different from those in *United States v. Place*, 462 US 696, 709, 103 S Ct 2637, 77 L Ed 2d 110 (1983), in which the United States Supreme Court held that a detention of 90 minutes was unreasonable because, during that period, the Drug Enforcement Administration agents did not diligently pursue their investigation of the luggage seized, transported the luggage to a different site, and misinformed the detainee as to the expected course of the investigation. I would hold that the 31-minute period was a reasonable time within which to conduct the investigation.

In sum, because Burdick had a suspicion that the car was being used to transport contraband, and because that suspicion was reasonable under the totality of the circumstances, Burdick could detain the car for a reasonable period of time for investigatory purposes. Moreover, the troopers diligently pursued their investigation and the detention lasted no longer than was necessary to effectuate the purposes of the detention. Therefore, the seizure, if any, was justified under Article I, section 9.

## THE DOG-SNIFF WAS NOT A SEARCH

Because I disagree with the majority's holding that Burdick seized the car, I proceed to consider the Court of Appeals' holding that the dog-sniff in this case was a search for purposes of Article I, section 9.[9] I would hold that the dog-sniff here did not constitute a search within the meaning of Article I, section 9.

No search of any person or of any item attached to any person occurred. No entry was made into the interior of the car. The odor emanating through the car's open windows announced its contents and, therefore, under the "plain smell" variant of the "plain view" doctrine, defendant had no cognizable privacy interest that was invaded. *See State v. Wacker*, 317 Or 419, 425, 856 P2d 1029 (1993) ("The privacy interests protected * * * under Article I, section 9, are defined by an objective test of whether the government's conduct

---

[9] The Court of Appeals' holding that a dog-sniff is a search within the meaning of Article I, section 9, is contrary to federal authority and to the holdings of a majority of the state appellate courts that have considered the issue under their own constitutions. *See State v. Slowikowski*, 87 Or App 677, 681-82, 743 P2d 1126 (1987), *aff'd on other grounds* 307 Or 19, 761 P2d 1315 (1988) (the overwhelming trend among the courts, including the United States Supreme Court, is to find that the use of a trained dog to sniff property located in a public place is not a search); *State v. Kosta*, 75 Or App 713, 719, 708 P2d 365 (1985), *aff'd on other grounds* 304 Or 549, 748 P2d 72 (1987) (investigation after valid stop, limited in intensity and scope, does not constitute an unreasonable search under Article I, section 9).

In *State v. Smith*, 148 Or App 235, 939 P2d 157 (1997), two of the Court of Appeals' judges that found the use of a dog to be a search in the present case, retreated from that conclusion and stated that they were wrong in holding that a dog-sniff is a search under Article I, section 9. *Id.* at 246 (Warren, J., concurring); *id.* at 261 (De Muniz, J., dissenting). Although it is not entirely clear, it appears that a slim majority of the Court of Appeals now believes that a dog-sniff is a search within the meaning of Article I, section 9.

'would significantly impair an individual's interest in freedom from scrutiny, *i.e.*, his privacy.' "); *State v. Ainsworth*, 310 Or 613, 616, 801 P2d 749 (1990) (the threshold question in any Article I, section 9, search analysis is whether the governmental conduct at issue is sufficiently intrusive to be classified as a search); *State v. Tanner*, 304 Or 312, 321-22 n 7, 745 P2d 757 (1987) (the rights protected under Article I, section 9, are defined not by the privacy one expects but by the privacy one has the right to expect from the government); *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986) (no warrant is required to open and seize the contents of container that announces its contents). The car was parked in a public place. The dog-sniff took place without any physical intrusion into the contents or the interior of the car. Defendant had no right to expect privacy from the troopers in the air outside the car. Because no privacy interest of defendant was implicated in these circumstances, no search occurred under Article I, section 9.

If it is not an impermissible intrusion on privacy to observe the occupants of a car by using a "starlight scope" to magnify images and to enhance night vision, *Wacker*, 317 Or at 429, and if it is not an impermissible intrusion on privacy to walk around a car and look through its windows, *State v. Jackson*, 296 Or 430, 438, 677 P2d 21 (1984), and if it is not an impermissible intrusion to shine a flashlight on a person who is inside a car, *State v. Evans*, 101 Or App 340, 709 P2d 1177 (1990), how can it be an impermissible intrusion on privacy for a dog to sniff the air outside a car that is parked in a public place?[10]

I agree with the well-reasoned dissent authored by Judge Edmonds and joined by Judge Riggs in *Juarez-Godinez*, 135 Or App at 608. I also agree with the dissent authored by Judge Edmonds and joined by Judges Riggs and De Muniz in *State v. Smith*, 148 Or App 235, 260, 939 P2d 157 (1997). The dog-sniff in this case was not a search for purposes of Article I, section 9.

---

[10] In *State v. Slowikowski*, 307 Or 19, 26-27, 761 P2d 1315 (1988), this court recognized that trained dogs have been used for police investigative purposes "since long before the advent of either the state or federal constitutions," thus suggesting, without deciding, that there may be a historical exception for such use of dogs, *i.e.*, such a use would not be a search.

## PROBABLE CAUSE ESTABLISHED

Defendant argues that Burdick's affidavit failed to establish probable cause to search. Neither the Court of Appeals nor the majority in this case reached this issue. I would hold, however, that the affidavit was sufficient. All the facts recited by Burdick, when coupled with the fact that the dog "alerted" to the exterior of the car, are sufficient to establish probable cause to believe that controlled substances were present in the car. *See State v. Anspach*, 298 Or 375, 380-81, 692 P2d 602 (1984) (probable cause means that the facts on which the warrant is premised must lead a reasonable person to believe that seizeable things probably will be found in the location to be searched). *See United States v. Quinn*, 815 F2d 153, 159-60 (1st Cir 1987) (probable cause established when dog alerted to presence of drugs in car). Defendant's argument to the contrary is unpersuasive.

## MEASURE 40

Section (1) of Measure 40, enacted in 1996, provides in part that all victims in all prosecutions for crime and juvenile delinquency proceedings are granted the following rights:

"(f) The right to have all relevant evidence admissible against the criminal defendant[.]"[11]

Section 2 of Measure 40 further provides, in part:

"(2) The rights conferred on victims by this section shall be limited only to the extent required by the United States Constitution; Section 9, Article I, and Section 12, Article I of this Constitution shall not be construed more broadly than the United States Constitution * * *."

Thus, after the enactment of Measure 40, Article I, section 9, may not provide greater protection than the Fourth Amendment. I would hold that, even if Burdick violated Article I,

---

[11] The exclusionary rule is a judicial creation which relates to a remedy rather than to the scope of substantive rights protected by the state or federal constitutions.

section 9, nothing the troopers did in this case violated the Fourth Amendment.[12] *Place*, 462 US at 707.[13]

Evidence is not subject to suppression under the Fourth Amendment unless a violation of that provision has occurred. *State v. Rodriguez*, 317 Or 27, 44, 854 P2d 399 (1993). The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. The principal object of the Fourth Amendment is the protection of privacy, rather than property.[14] *Warden v. Hayden*, 387 US 294, 304, 87 S Ct 1642, 18 L Ed 2d 782 (1967). Under the Fourth Amendment, a seizure of property occurs when, in view of all the circumstances surrounding the incident, a governmental intrusion meaningfully interferes with an individual's possessory interest. *Arizona v. Hicks*, 480 US 321, 324-25, 107 S Ct 1149, 94 L Ed 2d 347 (1987); *United States v. Jacobsen*, 466 US 109, 113, 104 S Ct 1652, 80 L Ed 2d 85 (1984). A determination whether property has been "seized" for Fourth Amendment purposes requires a fact-specific inquiry into the totality of the circumstances of the particular case. For the reasons stated with regards to my state constitutional analysis, I would hold that under the Fourth Amendment, the troopers did not seize or detain defendant's car.

---

[12] A decade ago, in a dissenting opinion in *State v. Dixson/Digby*, 87 Or App 1, 16, 740 P2d 1224 (1987), *rev'd* 307 Or 195, 766 P2d 1015 (1988), I wrote the following:

"I find no *principled* reason to impose a higher standard governing law enforcement officers under Article I, section 9, of the Oregon Constitution, than is imposed by the Fourth Amendment." (Van Hoomissen, J., dissenting; emphasis in original.)

In that same opinion, I predicted that Oregonians would soon tire of state judicial decisions that appeared to be contrary to common sense and eventually would amend the Oregon Constitution to ensure rational law enforcement. *Id.* at 29-31. This is precisely the type of case that Measure 40 was intended to reach.

[13] In *United States v. Jacobsen*, 466 US 109, 123-24, 104 S Ct 1652, 80 L Ed 2d 85 (1984), the United States Supreme Court expressly adopted its conclusion in *Place* as a holding.

[14] Since *Katz v. United States*, 389 US 347, 353, 88 S Ct 507, 19 L Ed 2d 576 (1967), the United State Supreme Court has defined a Fourth Amendment search as a government action that infringes on a "reasonable expectation of privacy."

Further, even if the troopers did seize or detain the car, that detention was justified on the basis of Trooper Burdick's reasonable suspicion that the car was being used to transport illegal narcotics.

In *Terry v. Ohio*, 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968), the United States Supreme Court adopted a dual inquiry for evaluating the reasonableness of an investigative stop of a person under the Fourth Amendment.[15] The court examined whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place. *Id.* at 20. Under the Fourth Amendment, an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 US 491, 500, 103 S Ct 1319, 75 L Ed 2d 229 (1983). In assessing the length of the detention, the court takes into account whether the police diligently pursued their investigation. *Place*, 462 US at 709; *Royer*, 460 US at 500. No rigid time limitation is imposed; rather, courts must consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. "[C]ommon sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe*, 470 US 675, 685, 105 S Ct 1568, 84 L Ed 2d 605 (1985). When, as is true in this case, the police are acting in a swiftly developing situation, courts should not indulge in unrealistic "second-guessing." *Sharpe*, 470 US at 686. The question, always, is whether, under the circumstances, the police acted reasonably. *Id.*, 470 US at 687; *see also United States v. Cortez*, 449 US 411, 418, 101 S Ct 690, 66 L Ed 2d 621 (1981) ("[T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."). The majority here recognizes that the question whether the troopers violated the Fourth Amendment is a "close one." 326 Or at 10.

In support of its conclusion that the facts arousing Burdick's suspicions were "too minimal," and the duration of the seizure "too lengthy," the majority compares this case to

---

[15] The general principles expressed in *Terry* regarding the stop of a person are applicable to the temporary detention of property. *Place*, 462 US at 702.

the circumstances of *Sokolow*. That comparison reveals the weakness of the majority's position on that matter. In *Sokolow*, the defendant bought two round trip airplane tickets for a total of $2,100 from a roll of $20 bills, traveled under a name different from that listed for his telephone number, was headed for Miami—a source of illegal drugs, traveled for 10 hours from Honolulu to stay in Miami for 48 hours, appeared nervous, and did not check his luggage. *Sokolow*, 490 US at 3. From those factors, taken together, the United States Supreme Court concluded that DEA agents lawfully stopped the defendant based on reasonable suspicion of drug activity. *Id.* at 9. As discussed with regard to my state constitutional analysis, the factors arousing Trooper Burdick's suspicion of drug activity in the present case were much more numerous and significant than were the factors that were held to be sufficient in *Sokolow*.

Moreover, the majority offers no support or analysis for its bald assertion that the seizure here was "too lengthy." I would hold that the 31-minute detention was reasonable. The troopers did not move the car; they were diligent in resolving their reasonable suspicion as quickly as possible. They fully informed defendant concerning the nature and scope of their investigation. Any detention of car was minimally intrusive and resulted in the least possible interference with defendant's possessory interests in the car. *See United States v. McCarthy*, 77 F3d 522, 531 (1st Cir), *cert den* 117 S Ct 479 (1996) (75-minute detention was reasonable); *United States v. Bloomfield*, 40 F3d 910, 917 (8th Cir 1994), *cert den* 115 S Ct 1970 (1995) (60-minute detention to await arrival of dog for drug sniff was reasonable); *United States v. Kopp*, 45 F3d 1450, 1454 (10th Cir), *cert den* 115 S Ct 1721 (1995) (52-minute detention for dog-sniff was reasonable); *United States v. Brown*, 24 F3d 1223, 1226 (10th Cir 1994) (30-minute detention of car for dog-sniff was reasonable); *United States v. Frost*, 999 F2d 737, 741 (3d Cir), *cert den* 114 S Ct 573 (1993) (80-minute detention of suitcase for dog-sniff was reasonable). Because it is unsupported by any analysis or authority, the majority's conclusion to the contrary here is little more than *ipsi dixit*.

Finally, according to the United States Supreme Court in *Place*, 462 US at 707, a dog-sniff in a public place is

not a search under the Fourth Amendment and, hence, requires no justification whatsoever.[16] *United States v. Gault*, 92 F3d 990, 992 (10th Cir), *cert den* 117 S Ct 321 (1996) (no search when dog-sniff performed on moving train); *United States v. Mendez*, 27 F3d 126, 129 n 4 (5th Cir 1994) (no search when dog-sniff performed on checked luggage in airport); *United States v. Jeffus*, 22 F3d 554, 557 (4th Cir 1994) (no search when officers conduct dog-sniff of perimeter of car lawfully stopped in public place); *United States v. Perez*, 37 F3d 510, 515-16 (9th Cir 1994) (no search when dog-sniff revealed contraband in undercarriage of van); *United States v. Lingenfelter*, 997 F2d 632, 638 (9th Cir 1993) (upholding lawfulness of dog-sniff of exterior of warehouse); *United States v. Lyons*, 957 F2d 615, 617 (8th Cir 1992) (no search when police dog tore open package after sniffing presence of drugs); *United States v. Morales-Zamora*, 914 F2d 200, 203-05 (10th Cir 1990) (upholding lawfulness of dog-sniff of exterior of lawfully stopped car). Although defendant generally has argued that the dog-sniff here constituted an unlawful search under the Fourth Amendment, he has not offered any case authority or reasoned argument in support of that conclusion, and I know of none.

## CONCLUSION

In summary, I would hold that Article I, section 9, was not violated and that the discovery of the cocaine, heroin, and marijuana in the car was lawful. But, even if Article I,

---

[16] In concluding that the use of the canine sniff technique in those circumstances did not constitute a search, the *Place* court stated that

"[a] 'canine sniff' by a well-trained narcotics detection dog * * * does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer' rummaging throughout the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods. * * * We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure." *Place*, 462 US at 707.

section 9, was violated, under Measure 40,[17] suppression is not warranted, because the troopers did not violate the Fourth Amendment.

Accordingly, I would reverse the decision of the Court of Appeals in part and the order of the trial court and remand this case to the trial court with instructions to deny defendant's motion to suppress.[18]

---

[17] The constitutionality of Measure 40 itself is not at issue in this case and I express no opinion on that question.

[18] Justice Cardozo's oft-quoted observation: "The criminal is to go free because the constable has blundered," appears to be applicable in this case. However, I suggest that in this case it is not the constable who has blundered.